■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v VICTOR LEE, Appellant. [598 NYS2d 456] —Judgment of the Supreme Court, New York County (Joan Carey, J.), rendered July 12, 1991, convicting defendant, upon his plea of guilty, of attempted criminal possession of a weapon in the third degree and sentencing him to an indeterminate term of imprisonment of 2 to 4 years, reversed, the order of the same court and Justice, entered on or about March 8, 1991, which denied defendant's motion to suppress evidence, reversed, the motion granted, and the indictment dismissed. The matter is remitted to the trial court for the purpose of entering an order in favor of the accused pursuant to CPL 160.50, not less than 30 days after service of this order upon the respondent, with leave during this 30 day period to respondent to move and seek any further stay of the implementation of CPL 160.50 as in the interest of justice is required.

At issue on this appeal is the legality of the search of a bag carried by the defendant and the seizure of the weapon which was within it. Detective DiCamillo, the only witness at the

suppression hearing, testified that on the afternoon of July 17, 1988, he was working as a police officer with the Criminal Investigation Unit of the Penn Station Amtrak police when he was told by Captain Rutter, the commanding officer at Penn Station, that Rutter had received a telephone call from the Philadelphia Amtrak Police Department advising that a man resembling Ralph Birdsong, a suspect wanted in connection with a double homicide which had occurred at 5:30 that morning, was traveling on train 140 to New York. The man was described as a male black, five feet, eight inches tall, medium build, wearing blue suede shoes, a maroon shirt and four gold rings on his right hand, one of which was square shaped. While DiCamillo testified that prior to going to the track where train 140 was scheduled to arrive, he called Laura Frank, the Amtrak ticket agent who had sold the ticket to the suspect, he did not indicate what was said during that conversation. When train 140 arrived, defendant, who matched the given description exactly, walked onto the platform carrying a gray, white and orange plastic bag. He was approached by DiCamillo and Rutter, who identified themselves as police officers and asked defendant to stop, advising him that they wanted to ask him some questions. Before asking any questions, DiCamillo reached for the bag because defendant matched the description of the suspect in the double homicide and the detective was concerned for his safety. Upon doing so, DiCamillo felt a hard object in the bag that "had some weight", which, based on his experience, he "knew" was a gun. DiCamillo then took the bag, without opening it, and defendant was brought for questioning to the Amtrak police office where he was put in a holding cell and given *Miranda* warnings. Subsequently, after calling an Assistant District Attorney to see if he should open the bag, Detective DiCamillo did open it and found a .22 caliber "long rifle" revolver wrapped in two tee shirts inside a paper bag. Defendant was then fingerprinted. It was ultimately determined, after conferring with the Philadelphia police, that defendant was not Birdsong. At the conclusion of the hearing, defense counsel argued that the gun should be suppressed because Detective DiCamillo had no right to open the defendant's bag without a warrant. Additionally, counsel argued that the People had failed to meet their burden of showing that the initial stop was proper since there was no evidence to show either the basis on which the remitter of the information in Philadelphia had determined that Ralph Birdsong was a suspect in the homicide or why it was believed that appel-

lant resembled Birdsong. While the People requested additional time to research the issue, the court rejected that request as unnecessary. The court then denied the motion to suppress, finding that the information upon which Detective DiCamillo acted was reliable because it came from the Philadelphia Police Department and that once the officers saw defendant leave train number 140, matching the exact description they had been given, they had a right to stop and detain him for a reasonable period to determine whether he was a suspect in the Philadelphia homicide. The court further found that once the officers stopped him they had the right to frisk defendant and any items he was carrying because he was a suspect in a double homicide. Additionally, the court found that, although defendant was never actually arrested, since Detective DiCamillo felt the "outline of the gun" during the initial frisk, he was justified in subsequently opening the bag without a search warrant.

In *Matter of Marrhonda G.* (81 NY2d 942), the Court of Appeals held that the police may not conduct a warrantless search of a bag legally in their possession based solely on their ability to feel that the bag contains a weapon. In the case at bar, no other rationale justified the search of defendant's bag. As defendant himself was already in a cell in the Amtrak office when the bag was searched, it can hardly be said to have still been in his "grabbable area" so as to make the search necessary as a protective measure *(see, People v Brooks,* 65 NY2d 1021; *People v Gokey,* 60 NY2d 309, 312). Moreover, even assuming that defendant was under arrest and subject to a search incident to such arrest, the search of the bag was conducted well after it had come into exclusive police custody and after it had been removed from the area where defendant was stopped and taken into custody, thereby "dissipat[ing] the reasonableness of conducting a search" *(People v Smith,* 59 NY2d 454, 459). Nor was there any evidence of other exigency compelling the warrantless search or of any consent by defendant to the search. The absence of exigency is further emphasized by the fact that prior to opening the bag, Detective DiCamillo called an Assistant District Attorney to ascertain whether he should do so.

For these reasons, the weapon found in defendant's bag should be suppressed and the indictment dismissed. Moreover, were we not reversing based on the illegal search of defendant's bag, we would nevertheless require a new hearing on the legality of the original stop. Contrary to the suppression court, and our dissenting colleague, we find that once the

defense raised the issue of the reliability of the Philadelphia report, the People were obliged to go forward to demonstrate its reliability, and, absent such showing, the record is insufficient to sustain denial of the motion to suppress on this ground *(People v Havelka,* 45 NY2d 636).

It is well established that the police have the right, and the duty, to stop a citizen and inquire of him or her if they have reasonable suspicion that the citizen has committed, is committing or is about to commit a crime *(People v Stroller,* 42 NY2d 1052; *People v De Bour,* 40 NY2d 210). This is so, even if the information initially prompting the inquiry is hearsay *(People v Stroller, supra; People v Stewart,* 41 NY2d 65). However, if an officer relies *solely* upon hearsay uncorroborated by his or her own observations at the scene, and, as a result, is not personally apprised of sufficient information to constitute a reasonable suspicion, the stop will be valid only if the hearsay was received from another officer who did, in fact, possess sufficient information to constitute the requisite knowledge to justify the police conduct, in which case, the corroborating information is imputed to the receiver *(People v Havelka, supra,* at 641; *see also, People v Dodt,* 61 NY2d 408, 416). The officer in the field may presume the reliability of information received from a fellow officer *(People v McLaurin,* 43 NY2d 902, *revg on dissenting opn* 56 AD2d 80, 84) and the hearing court may, in turn, also rely on a presumption of reliability unless and until an objection is interposed by the defense. Upon such defense request, the prosecution must establish that the sender actually possessed reliable information upon which the transmission was based *(People v Havelka, supra,* at 641; *see also, Whiteley v Warden,* 401 US 560). Such request was timely made in the instant case.

There is, however, an exception to the People's obligation to establish the reliability of the sending officer's information. In a case where the court finds that the officer in the field did not rely solely on inadequately corroborated hearsay, and that the circumstances confronting that officer were such as to lend sufficient reliability to the hearsay, the officer's actions can be found to have been justified without calling the sending officer *(see, People v Landy,* 59 NY2d 369).

In the case before us, both the suppression court and the dissent have concluded that the prosecution satisfied its burden of going forward by demonstrating that the hearsay upon which the arresting officer relied was sufficiently corroborated by the circumstances confronting the officer at the scene so as to constitute the necessary reasonable suspicion, thereby obvi-

ating the necessity of calling the sending officer. In reaching such conclusion the dissent relies primarily upon language in *People v Benjamin* (51 NY2d 267, 270) in which the Court of Appeals noted that, even when the police are concededly not aware of the reliability of the hearsay information upon which they rely, the prosecution may be able to satisfy its burden of demonstrating sufficient corroboration to establish a reasonable suspicion by a showing that "the information conveyed was so specific and congruous with that which was actually encountered that its reliability reasonably could have been assumed" *(see also, People v Salaman,* 71 NY2d 869; *People v McLaurin, supra).*

While the defendant in this case did indeed meet exactly the description relayed from Philadelphia, that fact, without more, is not sufficient to establish the necessary reasonable suspicion under the circumstances here present.

Generally, those cases in which the congruity of a description has been found sufficient to justify an arrest have involved anonymous telephone tips in which the caller has reported that the very person described is, almost contemporaneously, committing a crime and/or carrying a weapon *(see, e.g., People v Salaman, supra; People v McLaurin, supra; People v Stroller, supra; People v Stewart, supra; People v Beltre,* 179 AD2d 353; *People v Ball,* 121 AD2d 551, *lv denied* 68 NY2d 767). In such a situation, the fact that the caller's description is accurate and that he or she has pinpointed the location of the person described may sufficiently imply that the caller has actually witnessed the weapon and thereby increases the probability that the rest of the report is accurate.

The instant situation, however, is significantly different. All that was relayed in the report from the Philadelphia police was that a person meeting defendant's description resembled the suspect in a double homicide. There was certainly no indication that the detail in the description meant that the caller had either witnessed the crime itself, or defendant's participation in such crime. At best, the implication arising from the statement was that the defendant had been seen getting on the train in Philadelphia by an officer who believed he might be, for reasons which remain unknown, a man named Ralph Birdsong, who was, for similarly undisclosed reasons, suspected of homicide. Thus, the very detailed description that was transmitted to the New York police was nothing more than a description of the defendant himself, who was said to *resemble* a homicide suspect. It would clearly be

inappropriate to bootstrap the accuracy of that description into proof of the reliability of those portions of the report that, in the first instance, named Ralph Birdsong as the homicide suspect and, additionally, that defendant might be Birdsong because he resembled him. Nor were there any other factors, aside from the description, which would either confirm the reliability of the information or independently provide the officer with a reasonable suspicion that defendant was, in fact, the homicide suspect (cf., People v Matienzo, 81 NY2d 778).

Since the source of the hearsay information in this case was the Philadelphia Police Department, rather than an anonymous tip, the arresting officer was entitled to rely on the unsupported statement that a person fitting defendant's description was a homicide "suspect". However, at the hearing on the motion to suppress, once the defense interposed its objection, the court was not similarly entitled. At that point, in order to sustain its burden of going forward, the prosecution was obligated to offer proof of the reliability of the information conveyed to the arresting officer.

Accordingly, we find that, once the issue was raised by defense counsel, the People were required to establish the source and nature of the information available to the Philadelphia police, and it was the hearing court's responsibility to consider the information and evaluate its reliability (People v Havelka, supra). In this context, we note that this case does not fall within the exception to such requirement delineated in People v Petralia (62 NY2d 47, cert denied 469 US 852), which held that, in certain circumstances, the court may rely on other witnesses, including the arresting officer, to establish the source of the sending officer's knowledge. Here, the arresting officer had no information at all concerning the Philadelphia Police Department's source.

While the People are generally entitled to only one opportunity to prove the reliability of the information upon which an officer has relied (People v Havelka, supra, at 643-644), an exception exists when the court's misunderstanding of the law results in the People not having a full opportunity to present supporting evidence (supra, at 643). Such appears to have here been the case. The prosecutor was clearly reluctant to continue without responding to defense counsel's request, noting that "the law with regard to this area is not clear cut." The court, however, believing this to be unnecessary denied the prosecutor's request for additional time. Under these circumstances, were we not reversing on other grounds, we would afford the People an opportunity to present evidence concern-

ing the reliability of the information remitted by the Philadelphia police. Concur—Carro, J. P., Milonas and Ellerin, JJ.

Asch, J., dissents in a memorandum as follows: The initial issue presented on this appeal is the legality of the seizure of the weapon which was within the bag carried by defendant. An additional issue is whether the People failed at the *Mapp* hearing to meet their burden of going forward to show the legality of the stop and frisk of the defendant where, admittedly, the information they received from the Philadelphia Police Department after challenge by defendant was not shown by independent proof to be reliable.

The only witness at the *Mapp* hearing was Detective Vincent P. DiCamillo. He testified that on July 17, 1988, he was employed by the Amtrak Police Department, and was advised by Captain Rutter, commanding the Amtrak police at Penn Station that day, that the Philadelphia Amtrak police had telephoned with information that a suspect in a double homicide was traveling on train 140 from Philadelphia to New York. The information was that the name of the suspect in the homicide was Ralph Birdsong and that the suspect on the train resembled said Birdsong. The description given was a black adult male, five feet, six inches to five feet, eight inches tall, medium build, 150 to 160 pounds, wearing four gold rings on his right hand, one of which was a large square gold ring. The suspect was also described as wearing blue suede shoes and a maroon shirt.

When the train got into Penn Station at about 3:00 P.M., Detective DiCamillo and Captain Rutter were on the platform at the rear of the train and three other officers were at the other end of the platform. The officers' attention was drawn to the defendant who had detrained. The defendant was a black adult male, approximately five feet, eight inches tall of medium build and wearing four gold rings on his right hand, one of which was a large square ring, and he was wearing blue suede shoes and a maroon top. The defendant was carrying a gray, white and orange plastic bag open at the top in his right hand. Detective DiCamillo and Captain Rutter approached and identified themselves as police officers. "We requested him to stop, that we wanted to ask him a couple of questions. I noticed the bag in his right hand. Okay? At that point I reached for the bag in his right hand because the information we had received was this person matched the description of a double homicide suspect. So in order to create a situation of safety for both Captain Rutter and myself [objection overruled at this point] I grabbed the bag. As I grabbed the bag, I felt a

hard object that had some weight to it. In my experience as a police officer, to me, it felt like a handgun. It had the same definition as—and weight."

Initially, the majority asserts that Detective DiCamillo had no right to search the bag in the Amtrak office once it had been removed from the defendant's " 'grabbable area' ". They cite *Matter of Marrhonda G.* (81 NY2d 942), in support of the conclusion that "the police may not conduct a warrantless search of a bag legally in their possession based solely on their ability to feel that the bag contains a weapon". However, *Marrhonda G.* dealt with a young juvenile who the police had stopped in the bus terminal upon suspicion she was a runaway. On going into the office to which she was brought, the respondent put her knapsack-type bag on the floor and sat about 15 feet away. A short time later, an officer picked up the bag and felt what he believed to be a gun. The bag was then opened and searched. The Court of Appeals found that there is no "plain-touch" exception to the warrant requirement *(see also, People v Diaz,* 81 NY2d 106), and accordingly held the warrantless search of respondent's bag to be unjustified.

However, the Court then pointedly advised: "As noted by the dissent (dissenting opn, at 947), our rejection of the plain-touch exception does not bar the application of some other exception to the warrant requirement. The officers could have justifiably searched the bag if it had been within respondent's 'grabbable area', if respondent had consented to the search, or if respondent had been placed under arrest and the bag then searched as an incident thereto." *(Matter of Marrhonda G., supra,* at 945.)

In the present case, as noted in the testimony of Detective DiCamillo, *supra,* "in order to create a situation of safety * * * I grabbed the bag. As I grabbed the bag, I felt a hard object that had some weight to it. In my experience as a police officer, to me, it felt like a handgun." Thus, our case squarely fits within the exceptions noted in *Marrhonda G.* The officers were allowed to search the bag since it *was* within the "grabbable area" of defendant. Further, upon feeling the gun in an attempt to safeguard his and his fellow officer's safety, the detective had probable cause to arrest defendant at that time. Upon this arrest, the officers could justifiably search the bag as "an incident thereto" *(supra,* at 945). Thus, in *Matter of Marrhonda G.,* upon which the majority relies, the Court of Appeals made it clear that it does not intend to take away from the police officer the right to protect his life. That is

precisely the situation here which led to the discovery of the gun.

The majority claims that, even assuming the defendant was under lawful arrest and subject to search incident to arrest, the search of the bag was conducted well after the police took custody of it and after it had been removed from the initial stop. The majority quotes *People v Smith* (59 NY2d 454, 459) to conclude that this was sufficient to " 'dissipat[e] the reasonableness of conducting a search' ". However, the facts and principles set forth in that case support the legality of the action of the police officer here in opening the bag in which he felt the gun. Thus, in *Smith,* the defendant entered a subway without paying a fare. Two detectives, who noticed defendant was wearing a bullet-proof vest, arrested defendant at that location. Thereafter, they escorted defendant to a porter's room, 10 feet away, where they not only searched the person of defendant, but also searched a briefcase he had been carrying which contained a gun and handcuffs. The Court of Appeals instructed, *inter alia:*

"Whether the circumstances are such as to justify a warrantless search incident to arrest is to be determined, as we recognized in our first *Belton* decision (50 NY2d, at p 452, n 2), at the time of the arrest, but the justification does not necessarily dissipate with the making of the arrest. For compelling reasons, such as the safety of the officers or the public or to protect the person arrested from embarrassment, a search 'not significantly divorced in time or place from the arrest' may be conducted even though the arrested person has been subdued and his closed container is within the exclusive control of the police * * *

"The arrest and search of the briefcase were for all practical purposes conducted at the same time and in the same place. The conduct of the search was reasonable; one detective handcuffed defendant and searched his person while the other simultaneously searched the briefcase. Whether in fact defendant could have had access to the briefcase at the moment it was being searched is irrelevant. He clearly could have had when arrested and neither the distance from nor the time elapsed since the arrest was sufficient to dissipate the reasonableness of conducting a search of the briefcase without a warrant." *(Supra,* at 458-459.)

Here, the facts point even more ineluctably toward the reasonableness of the subsequent search of the defendant's open plastic bag. Detective DiCamillo had already felt the gun in the bag when he grabbed it to safeguard himself and his

partner. Consequently, taking the gun out of the bag was merely confirmatory. In addition, the defendant was stopped after he and others had disembarked from a train which had come in from Philadelphia. Thus, "the safety of the officers" and "the public" justified the removal of defendant to the police office in the Amtrak station, before the bag was searched. While the officer could have opened the bag immediately upon entering that office and safeguarding the defendant, it is not surprising and, in fact, very responsible, that he called an assistant District Attorney to receive advice before opening the bag. Accordingly, the removal of the gun from the bag by the officer without a warrant was reasonable and lawful under the circumstances.

Defendant claims, as noted above, that the People did not meet their burden of showing the reliability of the Philadelphia Police Department's telephone call requesting defendant's arrest and thus failed to show that there was probable cause for his arrest. Defendant also asserts there was no proper predicate to "frisk" his bag initially.

I agree that if the police, on observing defendant immediately arrested him and searched his belongings, any contraband discovered would have to be suppressed, since the People did not show, in this case, the reliability of the information from the source in Philadelphia (see, People v Lypka, 36 NY2d 210, 214; People v Havelka, 45 NY2d 636).

However, that was not the sequence of events as they transpired. The information received from Philadelphia was properly acted upon by the police in approaching defendant to ask him "a couple of questions". In such a situation the officers were duty bound to investigate this information received from Philadelphia (People v Landy, 59 NY2d 369, 374).

"A police officer is entitled, and in fact is duty bound, to take action on a radio call. However, if a defendant later raises a legal challenge as to the permissible extent of such action, the People must take the initiative to show that in view of all the circumstances the action taken was justified * * * This can be done by sufficient explanation of the source of the call and proof of its reliability * * * or alternatively by showing that the information conveyed was so specific and congruous with that which was actually encountered that its reliability reasonably could have been assumed." (People v Benjamin, 51 NY2d 267, 270 [emphasis added].) The detailed description of the suspect in the double homicide herein was "so specific and congruous with that which was actually

encountered" with the defendant's appearance that "its reliability reasonably could have been assumed".

The majority asserts that this detailed description was not sufficient to establish the necessary reasonable suspicion under the circumstances herein, i.e., a report from the Philadelphia police that a person fitting defendant's description was a suspect in a double homicide. They distinguish this situation from cases involving anonymous telephone tips where the caller reports that the person described is committing a crime and/or carrying a weapon, noting that in the latter situation the fact that the caller's description is accurate and has pinpointed the location of the person described, "may sufficiently imply that the caller has actually witnessed the weapon and thereby increases the probability that the rest of the report is accurate". However, while the majority asserts it would be inappropriate to "bootstrap the accuracy" of a description into proof of the reliability of the rest of the report with respect to the case before us, the *same* objection applies to anonymous telephone callers. Such callers may maliciously and falsely report a neighbor or business rival committing a crime, but at the same time give a specific detailed description of that neighbor and pinpoint his/her location in the anonymous call. This possibility has not deterred the Court of Appeals from finding that action taken by the police on an official report, if challenged, can be shown to have been justified by sufficient explanation of the source of the information and proof of its reliability *or* by a showing the information was so specific and congruous with the situation encountered that its reliability can reasonably be assumed *(People v Benjamin, supra; see also,* cases cited above and in majority mem). In short, the dichotomy which the majority seeks to draw between anonymous calls and official reports is a distinction without a real difference.

Thus, at this point the officers had a reasonable suspicion which justified stopping defendant to inquire *(People v De Bour,* 40 NY2d 210, 223). *De Bour* itself suggests strongly that it is normally proper for a police officer, acting with the requisite level of suspicion, to approach an individual for information and as part of that encounter, ask questions that relate to the person's identity and reason for being in the area. This would include a request for identification." *(People v Hollman,* 79 NY2d 181, 190-191.) Before this inquiry was undertaken, the officers had a right to "frisk" defendant to insure their own safety, since they had been told he was a suspect in a double homicide. This limited degree of intrusion

was not unreasonable *(see,* CPL 140.50 [3]; *People v Salaman,* 71 NY2d 869; *People v Mack,* 26 NY2d 311, 316-318, *cert denied* 400 US 960). Further, officers who "conduct a valid stop and frisk, are not limited to a patdown of the suspect's person and may examine personal items capable of concealing a weapon within the suspect's grabbable reach" *(People v Brooks,* 65 NY2d 1021, 1023). We have most recently held in a similar case, that "it is well established that the officer was entitled, as part of a limited protective pat down of the defendant, to feel the outside of the bag which the defendant carried on his person" *(People v Cartagena,* 189 AD2d 67, 72). Thus, Detective DiCamillo was justified in taking the open plastic bag from the defendant before any questioning, especially in view of his testimony that he feared for the safety of himself and the Captain. Once he held the bag and felt the gun inside, he, as authorized by the four-part gradation set forth in *De Bour (supra),* could arrest and take defendant into custody because he then had probable cause to believe the defendant had committed a crime in his presence.