[726 NYS2d 65]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v JOSEPH HEROLD, Appellant.

First Department, May 15, 2001

APPEARANCES OF COUNSEL

*Robert W. Gifford* of counsel (*Michael S. Morgan* on the brief; *Robert M. Morgenthau, District Attorney* of New York County, attorney), for respondent.

*Steven R. Berko* of counsel (*M. Sue Wycoff*, attorney), for appellant.

### OPINION OF THE COURT

SULLIVAN, P. J.

On this appeal from his conviction, after a guilty plea, of criminal possession of a weapon in the third degree, defendant challenges, *inter alia*, the denial of his motion to suppress the gun recovered from him as well an incriminating post-arrest statement. The issue presented is whether the information in a police radio report containing a physical description of a man with a gun, furnished by a person at a specified address, otherwise unidentified, in combination with the officers' on-the-scene observations and the suspect's conduct, justifies a stop and frisk of the person so described.

The following facts were adduced at the suppression hearing. On the morning of March 2, 1998, at approximately 9:25 A.M.,

Police Officers Rodriguez and McNamara, in uniform and on motor patrol in the vicinity of 110th Street and Riverside Drive in Manhattan, received a radio report of a dispute in front of an apartment building at 160 West 116th Street, involving a man, described as a slim-built black male, about 5 feet, 10 inches tall, with a bald head, and wearing a black leather coat, armed with a gun. The radio report did not identify the person who reported the dispute, but indicated that it had been made by someone in a specified apartment in the same building.

The officers drove to 160 West 116th Street, arriving about a minute later. They observed no one in front of the building and entered the vestibule through an unlocked outside door. Finding the inside vestibule door locked, the officers rang the specified apartment and were immediately buzzed into the building.

As the officers waited for the elevator, a black man with a slim build and bald head, wearing a black leather jacket, identified in court as defendant, entered the building and knocked on the inner vestibule door. When Officer Rodriguez opened the door, he realized that defendant matched the description of the armed man given over the radio a minute earlier. Without further inquiry, Rodriguez directed defendant to "put his hands up." When defendant failed to comply immediately, McNamara placed his hands against the wall. As Rodriguez attempted to frisk him, defendant continually turned the left side of his body away from the officer. Rodriguez then felt a hard object, which he believed to be a handgun, on defendant's left side and, reaching into defendant's left inner jacket pocket, recovered a .32 caliber automatic pistol.

McNamara handcuffed defendant and, searching him, discovered that he was wearing a bulletproof vest. When McNamara informed Rodriguez of this fact, defendant interjected, "That's right, I'm ready for combat." Rodriguez radioed this information to the back-up team that had arrived during the search and was heading upstairs. Neither officer could recall if there had been any conversation over the intercom with the occupant of the specified apartment who buzzed them into the building.

In denying suppression, the motion court ruled that on the basis of a radio report of "a very dangerous situation" involving a dispute with a gun, the fact that defendant matched the description and was at the location reported and that he "acted in a nervous and reluctant way" when asked to raise his hands, the officers were entitled to frisk defendant "to assure their own safety." Thus, the court concluded, the gun was properly

seized, as was the bulletproof vest, during the subsequent search incident to a lawful arrest. The court also found that defendant's post-arrest statement was not the product of custodial interrogation, and was therefore admissible.

On appeal, defendant argues that the officers' frisk of him was illegal because it was based solely on the presumptively unreliable tip of an anonymous informant, whose reliability and knowledge of the criminal activity reported were never established. He contends that an anonymous tip giving a general description and location of an individual with a gun merely furnishes the police with the common-law right to inquire (*People v Stewart*, 41 NY2d 65, 69), whereas the officers' conduct in this case clearly exceeded that authority.

Bearing in mind that "reasonableness" is the touchstone of any inquiry into the propriety of police conduct in a police-citizen encounter (*People v Batista*, 88 NY2d 650, 653), a court must weigh the degree of intrusion that such conduct entails against the precipitating and attending circumstances (*People v De Bour*, 40 NY2d 210, 223). In our view, the police conduct in this case was reasonably related in scope and intensity to the level of information available to the officers at the time they took action. (*See, People v Cantor*, 36 NY2d 106, 111.)

Upon receiving a radio report of a dispute involving an armed man, the officers were duty bound to investigate. (*People v Benjamin*, 51 NY2d 267, 270; *People v Perez*, 224 AD2d 313, *affd* 88 NY2d 1059.) The radio report gave a reasonably detailed description of the man with the gun, including the suspect's gender, race, physical build, height, the fact that he was bald and the type and color of his jacket. It further provided a specific address where the suspect could be located. Arriving only a minute later, the officers confirmed the accuracy of the information by observing defendant, appearing almost exactly as described, entering the same building as mentioned in the report.

Defendant's argument that this information fails the *Aguilar-Spinelli* test for probable cause (*see, Spinelli v United States*, 393 US 410; *Aguilar v Texas*, 378 US 108) misses the point. To be sure, in evaluating probable cause based on hearsay information, New York applies the *Aguilar-Spinelli* test, which requires a showing that the informant was reliable and had some basis of knowledge of the information furnished. (*See, People v Bigelow*, 66 NY2d 417, 423; *People v Cruz*, 149 AD2d 151, 157.) Since, however, the initial stop in this case did not require probable cause, a lesser showing with respect to the

two prongs of the *Aguilar-Spinelli* test suffices. (*See, Alabama v White*, 496 US 325, 330 ["(r)easonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause"].)

Were it otherwise, the police, on the basis of hearsay information that fails to satisfy *Aguilar-Spinelli*, could never interfere with the rights of a citizen; probable cause would be required even for the most limited intrusions based on hearsay information. Such a requirement cannot be reconciled with existing precedent. (*See, People v Chase*, 85 NY2d 493, 501 [while no probable cause existed under *Aguilar-Spinelli*, matter remanded to the trial court to evaluate whether reasonable suspicion existed justifying a temporary detention]; *see also, People v Landy*, 59 NY2d 369, 376.)

Defendant relies on the United States Supreme Court's recent decision in *Florida v J.L.* (529 US 266), which held that an anonymous tip that a person is carrying a gun, without more, is insufficient to justify a police officer's stop and frisk of the person. The facts of *J.L.* are distinguishable. There, the police officer frisked the defendant based solely on information provided in an anonymous telephone call that a young black male, wearing a plaid shirt, standing at a particular bus stop, was carrying a gun. No basis as to the informant's veracity or basis of knowledge was provided.

It is clear from the Supreme Court's opinion in *J.L.* that its holding turned on the inherent unreliability of the unknown informant's information: "Unlike a tip from a known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated, see *Adams* v. *Williams,* 407 U.S. 143, 146-147 (1972), 'an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity,' *Alabama* v. *White*, 496 U.S., at 329." (*J.L.*, 529 US, *supra* at 270.) The Court further characterized the nature of the information in *J.L.* as "a call made from an unknown location by an unknown caller" and "the bare report of an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing he had inside information about J.L." (*Id.* at 270, 271.)

As seems apparent, the Supreme Court's concern over anonymous tips stemmed from the possibility of false reports

and the potential such reports had for the harassment of citizens by informants who, by virtue of their anonymity, could not be held accountable. Such risk, however, was substantially diminished in this case because the informant was not truly anonymous. The responding officers were aware that the call had emanated from a specific apartment in the very building outside of which the man with the gun was involved in a dispute. The reliability of the information was further enhanced by the fact that after responding within a minute of receiving the radio report, the officers were buzzed into the building after ringing the specified apartment—the identified source of the report. Such action is hardly indicative of a dishonest informant passing along scurrilous or unfounded accusations. Thus, unlike *J.L.*, the police here were afforded a means of verifying the source of the information—by going to the specified apartment and speaking to the complainant. (*See, e.g., People v Hernandez*, 232 AD2d 181, 181-182 [radio report of a burglary in progress involving two described Hispanic men more reliable than an anonymous tip where the caller left a call back number where he could be reached].) In fact, that is just what the officers were in the process of doing when they were suddenly confronted by defendant, who precisely fit the description of the man with the gun.

Additionally, by inviting a police response to that specific building, the caller placed himself or herself at greater risk of prosecution if the information ultimately proved false. (*See, People v Hicks*, 38 NY2d 90, 94 [citizen informant deemed reliable where threat of prosecution existed for giving false statement to police; police had informant's name and address, and could track down informer if necessary].) While it is true that the caller did not give a name, and the record is unclear as to how the police became aware that the call emanated from the specified apartment, the act of buzzing in the officers a short time later when they responded to the building confirmed the caller's connection to a specific apartment and provided greater accountability than a mere anonymous informant. (*See, People v Hernandez, supra*, 232 AD2d 181.) Because of the informant's greater accountability, this partially identified informant bears much closer resemblance to an identified citizen informant, who is presumed to be reliable (*see, People v Parris*, 83 NY2d 342, 350), than to a truly anonymous informant, and *J.L.* is not controlling.

The informant's basis of knowledge was also adequately shown for purposes of demonstrating reasonable suspicion for

the stop. The hearing evidence demonstrated that the informant called the police from an apartment in the building outside of which the dispute involving the man with the gun was taking place. Because the information itself supported the conclusion that the informant was in close proximity to, and had some intimate knowledge of, an ongoing dispute, it can be fairly inferred, at least for purposes of establishing reasonable suspicion (*see, Alabama v White, supra,* 496 US at 330), that the informant's report of a man with a gun was based on the informant's own personal observations. (*See, People v Lee,* 193 AD2d 529, 533 [where anonymous call reported a described person carrying a weapon, that the caller's description is accurate and the suspect's location pinpointed may sufficiently imply that the caller has actually witnessed the weapon]; *cf., People v Parris, supra,* 83 NY2d at 350 [basis of knowledge not established where no factual basis for alleged eyewitness's belief that the premises were being burglarized, such as the suspect's movements entering or exiting the premises].)

Even if the caller's information were insufficient to justify an immediate frisk of defendant, it unquestionably provided the police with the common-law right to inquire (*People v Stewart, supra,* 41 NY2d at 69), which is "activated by a founded suspicion that criminal activity is afoot," and entitles a police officer "to interfere with a citizen to the extent necessary to gain explanatory information, but short of a forcible seizure" (*People v De Bour, supra,* 40 NY2d at 223; *see, People v Hollman,* 79 NY2d 181, 191-192).

Where a described suspect is alleged to be armed with a gun, courts have consistently recognized that the police, in undertaking a common-law inquiry of the suspect, must be permitted to take limited precautionary measures to protect themselves (*see, People v Dawson,* 243 AD2d 318, *lv denied* 91 NY2d 890 [defendant's matching description of man with a gun and his presence at described location justified minimally intrusive direction to defendant to remove his hands from pockets and come toward police]; *Matter of Clarence W.,* 210 AD2d 71, 71-72, *lv denied* 86 NY2d 709 [radio report of 10 males with guns authorized minimal intrusion of ordering respondent to remove hands from pockets; reliability enhanced by police observations at location within a minute of transmission]). Such limited precautionary measures, if warranted by the circumstances, are permissible. (*See, Matter of Clarence W., supra; see also, People v Perez, supra,* 224 AD2d at 313-314.)

In the present case, the facts and circumstances known to the police in this rapidly unfolding encounter justified similar

precautionary measures. After receiving a radio report of an armed man involved in a dispute at a specific building, the officers, arriving at the location a minute later, were suddenly confronted by someone who matched the description of the man with the gun. Additionally, that the encounter with this potentially armed man took place in an enclosed building lobby unquestionably heightened the risk of danger to the officers. (*See, People v Stevens*, 255 AD2d 145, *lv denied* 93 NY2d 858 [request to four individuals to raise hands was a reasonable and limited intrusion after police received call of heated dispute with a firearm at a specific building, and police observed four men, one claiming he was a State Trooper, in a dispute in an enclosed vestibule].) Faced with these facts, and without the opportunity of evaluating the suspect or the situation from afar, Officer Rodriguez took the minimally intrusive step of directing defendant to raise his hands. Given the subject of the radio report, and the mere second or two that he had to assess the level of danger posed, we find nothing unreasonable in the officer's conduct.

Once defendant, acting in a "reluctant" manner, was slow to comply with Rodriguez's direction, Officer McNamara properly placed defendant's hands on the wall (*see, People v Oppedisano*, 176 AD2d 667, *lv denied* 79 NY2d 1052 [officer forcibly took defendant's hands out of his pockets where his only response to officer's request was to take step back]). Defendant's uncooperative behavior continued as he repeatedly attempted to turn his left side away from Rodriguez, as if shielding that area from the officer. At that juncture, in light of the information in the radio report, the officers' confirmatory observations and defendant's behavior at the scene, the officers could reasonably suspect that defendant was armed, justifying a frisk for weapons. (*See, People v Dawson, supra*, 243 AD2d at 320-321 [defendant's initial failure to comply with direction to remove hands from pockets and continued moving around justified frisk]; *Matter of Clarence W., supra*, 210 AD2d at 72 [patting of respondent's waistband justified where he refused to take hands out of pockets and actively resisted officers].)

Once the officers recovered the gun, they had probable cause to arrest defendant and the bulletproof vest was recovered pursuant to a valid search incident to a lawful arrest. Additionally, as the court properly found that no custodial interrogation had occurred (*see, People v Rivers*, 56 NY2d 476, 479-480), suppression of defendant's statement was properly denied.

We have examined defendant's other argument concerning the summary denial of his *pro se* post-conviction motion alleg-

ing the ineffective assistance of counsel and find it to be frivolous on its face.

Accordingly, the judgment of the Supreme Court, New York County (Harold Beeler, J.), rendered March 29, 1999, convicting defendant, upon his plea of guilty, of criminal possession of a weapon in the third degree, and sentencing him to an indeterminate term of $1\frac{3}{4}$ to $3\frac{1}{2}$ years, should be affirmed.

ROSENBERGER, MAZZARELLI, LERNER and BUCKLEY, JJ., concur.

Judgment, Supreme Court, New York County, rendered March 29, 1999, affirmed.