*681 OPINION OF THE COURT
Nicholas Iacovetta, J.
Defendant is charged with the crime of criminal possession of a weapon in the third degree (Penal Law § 265.02 [4]) and related crimes.
He moves to suppress physical evidence, a firearm, because it was recovered as a result of his unlawful arrest. A Mapp hearing was held on May 15 and May 23, 2001. The People called two witnesses, Police Officer (P.O.) Eileen Reyes and P.O. Giuseppe Dellarusso. The defense did not call any witnesses.
Findings of Fact
At 12:05 a.m. on June 25, 2000, a New York City 911 operator received a 911 call stating that four young, tall, black men, teenagers, were in the third floor hallway opposite apartment 3K at 741 Hunts Point Avenue in the Bronx. The male caller stated that they had a little silver, chrome gun which looked like a little .22 caliber. The caller stated that the above observations were made by the caller as the caller looked through the peephole of the caller’s apartment.
The caller also stated that there was a party going on in apartment 3K at the time and that the four men had entered apartment 3K after they fired a single shot in the hallway but that they were now back in the hallway. The caller did not give his name but urged the 911 operator to “hurry up and get here because nobody can be coming down, little kids, everything.”
The 911 operator then made an entry into the computer system used to transmit call information to the New York City Police Department (NYPD). At 12:14 a.m. the NYPD dispatcher broadcast a report of a 10-10, shots fired, at 741 Hunts Point Avenue with a male complainant stating “there was one shot fired by four male blacks, one tall with a silver handgun, fired a shot and ran into apartment 3 King on the third floor at 741 Hunts Point Avenue.” When an unidentified sector car requested a description, the NYPD dispatcher replied, “at this time it’s just stating a male black. He was tall with a silver handgun.”
At the hearing, P.O. Reyes remembered responding to a radio run on June 25 at about 12:15 a.m. which she recalled as stating “shots fired, describing a male black, tall with jeans, on the third floor landing at 741 Hunts Point Avenue.” P.O. Dellarusso remembered the same radio transmission as stating *682 “shots fired, man with a gun, tall male black sitting on the third floor of 741 Hunts Point Avenue.”
Both officers were in uniform, in a marked radio car when they arrived at the above address within five minutes after receiving the above radio run. The front door of the building was closed. Before the officers could use the adjacent intercom system they were buzzed in by an unknown party, while other unnamed people were telling them that the male was on the third floor.
The officers took the steps to the third floor with Officer Reyes in front when she saw the defendant, a male black over six feet tall, sitting alone on the staircase between the third and fourth floor landing. No one else was in the hallway. The defendant was wearing jeans. Both officers could hear the sounds of a party emanating from the open door of an apartment on the third floor.
Neither officer drew their weapon. Officer Reyes asked defendant “to show me his hands” so she could get a clear view of defendant’s hands before approaching him. The defendant stood up. His hands were empty. Officer Reyes approached the defendant and asked him if he had any weapons. The defendant replied, “Yes, I do. I have a gun,” as he put up his hands in the air without any order to do so. He said it was in his left pocket. Officer Reyes reached inside and found nothing. Defendant then stated, “Oh, oh wait. It’s in my right pocket.” Officer Reyes reached inside and recovered a .380 caliber pistol in defendant’s front pocket. It had no ammunition clip. Officer Reyes then recovered a magazine clip loaded with four rounds of ammunition in defendant’s right rear pocket. Defendant was then brought down from the stairs to the third floor landing, put against the wall, and handcuffed. He was then transported to the 41st Precinct.
The Court found the testimony of both officers credible and trustworthy despite the fact that Officer Reyes erred when she remembered the radio call described the suspect as wearing jeans. The tape of the call did not contain any clothing description. The written Sprint report concerning the call, however, was not produced in court. Officer Dellarusso was likewise mistaken when he remembered the radio call described the suspect as “sitting” on the third floor. Both officers apparently confused a portion of what they saw at their arrival with what was said in the call. The Court, based on their overall testimony and demeanor, does not believe this was done intentionally or meant to tailor their testimony to satisfy constitutional safeguards.
*683 Conclusions of Law
In a motion to suppress physical evidence the People have the burden of going forward to show the legality of the police conduct in the first instance. Once they have done so, the defendant bears the ultimate burden of proving that the evidence should not be used against him (see People v Berrios, 28 NY2d 361, 367, citing People v Malinsky, 15 NY2d 86, 91; People v Whitehurst, 25 NY2d 389, 391).
A court’s inquiry into the propriety of police conduct must weigh the degree of intrusion it entails against the precipitating and attending circumstances (People v De Bour, 40 NY2d 210, 223). The court’s inquiry must focus on whether or not the police conduct was reasonable in view of the totality of the circumstances (People v Batista, 88 NY2d 650, 653; People v Smith, 228 AD2d 173, lv denied 88 NY2d 1071).
The Court finds that the police conduct in this case was reasonably related in scope and intensity to the level of information available to the officers at the time they took action (see People v Cantor, 36 NY2d 106, 111).
The Court’s analysis begins with the recognition that an anonymous tip of a man with a gun is, without more, an insufficient basis for stopping and frisking a suspect because such a report lacks the reasonable suspicion required for such action (see Florida v J. L., 529 US 266; People v Ballard, 279 AD2d 529).
An anonymous tip, however, clearly provides the police with the common-law right to make a level two De Bour inquiry (see People v Stewart, 41 NY2d 65, 69; People v Major, 263 AD2d 360 [1st Dept], lv denied 94 NY2d 825).
The common-law right to inquire is “activated by a founded suspicion that criminal activity is afoot,” and entitles a police officer “to interfere with a citizen to the extent necessary to gain explanatory information, but short of a forcible seizure” (People v De Bour, supra, at 223; People v Hollman, 79 NY2d 181, 191, 192). This is exactly what occurred here.
The police were duty-bound to investigate the radio report they received of a man with a gun (see People v Benjamin, 51 NY2d 267, 270). They arrived within five minutes and found the defendant matching the description of a young, tall, black male in the exact location of the third floor hallway of the specific address noted in the report. No one else was present. The defendant’s NYSIB sheet lists his height as six feet three inches. The CJA sheet lists his age at the arrest as 21. He looked younger in the courtroom.
*684 The police who were in uniform did not draw their weapons. The officer simply asked the defendant to show his hands and inquired if he had a gun. Such actions did not constitute a stop or seizure of the defendant (see People v Bora, 83 NY2d 531). The test is whether a reasonable person would have believed, under the circumstances, that the officer’s conduct was a significant limitation on his or her freedom (see People v Hollman, supra, at 191, 192; People v Hicks, 68 NY2d 234, 240). The defendant was seated, not moving, when the officer approached him. He neither attempted nor was prevented from leaving. No weapons were drawn. Only two officers, in uniform, one behind the other, were present. The two verbal commands or questions were short and normal in tone.
Courts have routinely acknowledged the right of police to take limited precautionary measures to protect themselves when conducting a common-law inquiry after receipt of a report of a described suspect with a gun in a described location (see People v Herold, 282 AD2d 1 [1st Dept], citing People v Dawson, 243 AD2d 318, lv denied 91 NY2d 890 [where just such a report justified the minimally intrusive direction to defendant to remove his hands from his pockets and come toward police]; Matter of Clarence W., 210 AD2d 71, 72, lv denied 86 NY2d 709 [where similar report authorized minimal intrusion of ordering defendant to remove hands from pocket]). Here, the defendant’s hands were not in his pockets. He was seated and the officer merely asked to see them to get a clearer view.
Moreover, the anonymous caller here did not just inform the police that a described person had a gun but also stated that the gun had been fired (see People v Tucker, 207 AD2d 748 [1st Dept 1994], lv denied 84 NY2d 940). There is a difference of significant degree between a report only that a man has a gun in his possession and another report that a person not only has a gun but that he has just used it for the commission of a crime (see People v Francis, 108 AD2d 322 [1st Dept 1985]). Here, the report stated the suspect fired the weapon in the hallway of an occupied building.
A further escalating factor that permitted the level of police conduct in this case is that the encounter with a potentially armed suspect occurred in the enclosed space of a building hallway between floors which increased the level of danger to the officers (see People v Herold, supra, citing People v Stevens, 255 AD2d 145, lv denied 93 NY2d 858 [where request that four suspects raise their hands was held to be a reasonable and limited intrusion after police received a call of a dispute involving a gun at a specific building]).
*685 Moreover, the caller in this case, like the one in People v Herold (supra), can more clearly be compared to that of an identified citizen informant who is presumed to be reliable rather than to a truly anonymous citizen.
Here, the caller told the 911 operator that he was looking through his peephole when he saw someone with a gun which demonstrates the basis of the informant’s knowledge. The reliability of the male informant is established by the fact that although he declined to leave a name, he obviously lived on the third floor since he was observing the reported events on the third floor through the peephole of his apartment. The police knew his gender which would also aid in his identification.
Although the anonymous caller in Herold (supra), unlike here, gave the police the caller’s specific apartment, the present caller’s connection to an apartment on a specific floor at a specific address still made the caller potentially identifiable which provides greater accountability than a mere anonymous informant who had no fear of ever being identified or located (see People v Herold, supra).
Reliability of the call is enhanced further by the fact that he directed the police to a specific building and mentioned a party in a specific apartment on a specific floor. Likewise, the fact that the police arrived in minutes and were buzzed into the building without even ringing the bell confirms the caller’s likely connection to an apartment in the specific building.
Moreover, although they did not stop to get their names, several people in front of the building corroborated the caller’s report that the suspect was on the third floor. Even if an officer does not have the time to obtain an informant’s name, a face-to-face encounter between the police and a citizen is more reliable than that of a totally anonymous informant (see People v Foster, 209 AD2d 348, affd 85 NY2d 1012).
Once the defendant told the officer that he had a gun in his left pocket, probable cause existed and the officer had the right to reach into defendant’s pocket and remove the weapon. After recovering the weapon from defendant’s pocket, the subsequent recovery of the loaded magazine clip from defendant’s other pocket was authorized as a search incident to defendant’s lawful arrest (People v Temple, 165 AD2d 748, 750).
Defense counsel’s reliance in oral argument on People v Jenkins (47 NY2d 722), People v Lypka (36 NY2d 210) and People v Havelka (45 NY2d 636) is misplaced.
Here, the police did not initially stop or arrest the defendant. They simply conducted a level two De Bour-type inquiry *686 without first stopping or arresting the defendant. Such police conduct is permitted pursuant to an anonymous call even though such a call is presumptively unreliable (see People v Stewart, supra). It is only when the police seek to stop or arrest a person solely on the basis of an anonymous call that the prosecution, when challenged, must establish the informant’s reliability and basis of knowledge (People v Herold, supra; People v Parris, 83 NY2d 342). That is not the case here. Otherwise the police, in the absence of reasonable suspicion or probable cause, would not be able to take any action when confronted with an anonymous report of criminal activity.
Moreover, there is no doubt as to the existence of the anonymous caller because his voice was heard on the tape of his call to the 911 operator which was put in evidence at the hearing by the People. It was also audible. Likewise, defendant’s reliance on the decision in United States v Colon (250 F3d 130 [2d Cir]) is misplaced.
In United States v Colon (supra), the government, unlike here, conceded that the defendant was stopped and frisked on the basis of an anonymous call. The government also conceded that the 911 operator did not transmit to the NYPD dispatcher the entire message that the 911 operator had received from the caller. The court held that the additional knowledge of the civilian 911 operator which was never conveyed to the NYPD dispatcher could not be imputed to the dispatcher or arresting officer, and, absent that additional knowledge, the officer lacked the reasonable suspicion necessary to stop and frisk defendant.
Here, unlike in United States v Colon (supra), the police did not stop or frisk the defendant on the basis of the anonymous call. They merely conducted a level two De Bour inquiry which does not require reasonable suspicion. Also, the 911 operator here did tell the NYPD dispatcher who in turn told the officers that a described suspect had a gun and was at a specific address on a specific floor. The transmission of the NYPD dispatcher to the officers was played at the hearing with a transcript and justified their level two De Bour inquiry of defendant (see People v Stewart, supra).
Defense counsel’s reliance on People v Gonzalez (39 NY2d 122) is also inapposite on the present facts because here the police were not relying on defendant’s purported consent to search allegedly provided by another, absent officer.
The motion to suppress the physical evidence is denied.