*198 OPINION OF THE COURT
Peter C. Buckley, J.
The defendant is charged with criminal possession of a weapon in the third degree (Penal Law § 265.02 [4]), alleged to have occurred in the City of Elmira on September 6, 2005. A Mapp hearing was conducted before me on June 15, 2006 to determine whether a weapon seized from the defendant should be suppressed.
Testifying at the Mapp hearing was Elmira City Police Officer Jonathan Hibbard. The defendant called no witnesses at the hearing.
Based upon the evidence received at the hearing, the court makes the following findings of fact and conclusions of law.
Findings of Fact
On September 6, 2005, at approximately 9:00 p.m., Officer Jonathan Hibbard was on duty for the Elmira Police Department when he received a radio communication stating that there was a black male in the area of Davis and West Third streets who was wearing a white T-shirt and blue jeans shorts running east on West Third Street with a gun. Officer Hibbard was nearby and responded to the call. Less than a minute from when the call came in, Officer Hibbard saw the defendant one block east of the location described in the original report, walking east on the south sidewalk of West Third Street. The defendant, a black male, was wearing a white T-shirt and blue jeans shorts. Officer Hibbard testified that he did not see anybody else in the area.
Officer Hibbard pulled his car close to the defendant and ordered him to place his hands on a fence that was adjacent to him. The defendant did not comply, but reached for his waistband and looked up and down the street. Officer Hibbard testified that the defendant looked nervous and was trembling. When the defendant persisted in refusing to comply with repeated instructions that he place his hands on the fence, Officer Hibbard drew his gun. The defendant still did not follow Officer Hibbard’s instructions.
A second officer, Officer Reed, then arrived at the scene and grabbed the defendant’s hands and put them behind his back, at which point Officer Hibbard placed the defendant in handcuffs. The defendant was then frisked, revealing that he had a cell phone in his waistband and a 9 millimeter semi *199 automatic handgun in his right rear pocket. Officer Hibbard testified that the gun was loaded, that the safety was off, and that there was a round in the chamber and seven live rounds in the magazine.
Conclusions of Law
“[A]ny inquiry into the propriety of police conduct must weigh the interference it entails against the precipitating and attending conditions.” (People v De Bour, 40 NY2d 210, 223 [1976].) “ ‘ [Reasonableness’ is the touchstone of any inquiry into the propriety of police conduct in a police-citizen encounter.” (People v Herold, 282 AD2d 1, 4 [1st Dept 2001], quoting People v Batista, 88 NY2d 650, 653 [1996].) Critical to this inquiry is a consideration of whether the conduct of the police “was reasonably related in scope and intensity to the level of information available to the officers at the time they took action.” (Id., citing People v Cantor, 36 NY2d 106, 111 [1975].) Thus, the questions presented by the case at bar are first, whether Officer Hibbard’s initial command to the defendant, that he place his hands on the fence, was reasonable in consideration of the totality of the circumstances and second, whether the subsequent handcuffing and frisk of the defendant were justified in light of the defendant’s behavior and failure to comply with Officer Hibbard’s instructions.
An anonymous tip identifying a man with a gun based on his clothing, race and location is insufficient by itself to generate reasonable suspicion that the individual “has committed, is committing or is about to commit a felony or misdemeanor” (De Bour, 40 NY2d at 223). However, where a set of circumstances is sufficient to arouse the interest of officers, a common-law right of inquiry is formed. (Id. at 220.) The close match between the defendant’s clothing, race, gender, location and direction of travel were objectively sufficient to arouse the interest of Officer Hibbard, especially in light of the fact that the defendant was the only individual in the area. Officer Hibbard therefore had a right to ask questions of the defendant to determine whether he might be the individual indicated by the 911 bulletin.
Because the initial encounter between Officer Hibbard and the defendant was not an inquiry but a command that he place his hands on the fence, it is necessary to consider whether such a command is consistent with a common-law right to inquire, rather than reasonable suspicion that the defendant had com *200 mitted, was committing or was about to commit a crime. An inquiry under common-law right based on an anonymous tip does not ordinarily entitle a forcible stop of an individual. (De Bour, 40 NY2d at 216.) However, more intrusive actions are permissible “where the anonymous information is so specific and congruous with that which is actually encountered that the reliability of the tip may be reasonably assumed.” (People v Dawson, 243 AD2d 318, 319-320 [1st Dept 1997].) In Dawson, an individual inside a building matched the race, clothing, gender, location and direction of travel of a man who was reported to have a gun. The defendant’s description in the case at bar similarly matched the gender, race and clothing of the suspect in the 911 bulletin. Moreover, the defendant was located by Officer Hibbard approximately one block east of the location where, less than a minute earlier, the suspect was described to be running east. Consistency between the reported location and the distance which a suspect might have traveled in a brief interval between the report and the police contact supports the officer’s belief that the individual encountered is the one described in the police report. (People v Andrews, 243 AD2d 321, 323-324 [1st Dept 1997].) Because the level of congruity between the suspect in the police report and the defendant in the case at bar matches that in Dawson, “more intrusive police action” than mere inquiry was justified.
Such intrusive action includes steps for the protection of the officers responding to a 911 report. “[Cjourts have consistently recognized that the police, in undertaking a common-law inquiry of the suspect, must be permitted to take limited precautionary measures to protect themselves.” (Herold, 282 AD2d at 7, citing Dawson, 243 AD2d at 318.) Where these measures constitute a minimally intrusive instruction to the suspect, they are permissible. (Dawson, 243 AD2d at 320.) In Herold, the police officers encountered an individual who, like the description of the suspect, was a bald black male with a slim build in a leather jacket at 160 West 116th Street. The safety measures taken by the police in ordering the defendant to place his hands up, then frisking him when he failed to comply were held by the Appellate Division, First Department, to constitute a reasonable application of the police officers’ right to protect themselves. (Herold, 282 AD2d at 7-8.)
Similarly, in Dawson, police officers encountered an individual who matched the race, clothing, gender and location of an individual described in a radio report as having a gun. (Dawson, *201 243 AD2d at 319.) The officers instructed defendant to take his hands out of his pockets. (Id.) This command, held to be permissible (id.), was identical in intent and effect to the command given by Officer Hibbard in the case at bar, that the defendant place his hands on a fence. In both cases, the command was given to prevent the defendant from reaching for the gun that the officer reasonably believed that he had. Because Officer Hibbard held a reasonable belief that the defendant was armed, his self-protective action in instructing the defendant to place his hands on the fence was also reasonable. That is, a reasonable police officer, believing that he was encountering a man who illegally possessed a gun, would give that man instructions designed to prevent him from accessing the weapon.
The fact that a person matches the race, gender, clothing and location of an individual with a gun permits police officers not only to give commands to the defendant but also to frisk for weapons where the officer is “justified in believing that the suspect is armed.” (People v Salaman, 71 NY2d, 869, 870 [1988], citing Terry v Ohio, 392 US 1, 27 [1968].) In Salaman, the police officer observed the defendant, who matched the clothing, race, gender and location of a man reported to have a gun, and patted him down after he complied with the officer’s instructions to place his hands on the hood of his car. (Salaman, 71 NY2d at 870.) The totality of the circumstances in the case at bar, when considered in an objective manner, certainly would justify a belief that the defendant was armed. The defendant’s close match of the description in the bulletin, combined with the fact that the defendant was the only individual observed in the area, would lead a reasonable person to conclude that there was a high probability that the defendant was the man described in the police report. Thus, even absent uncooperative and threatening behavior, the police had a right not only to tell the defendant to place his hands on the fence, but to perform the frisk which eventually ensued.
Where a suspect fails to comply with reasonable instructions from a police officer who is performing a common-law inquiry, the formation of a reasonable suspicion that the suspect poses a threat permits the officer to conduct a frisk for the safety of the officer and for the safety of those who may be nearby. (People v Robinson, 278 AD2d 808 [4th Dept 2000].) Moreover, an officer’s observation of suspicious or threatening behavior by an individual who matches a general description of a man with a gun furnishes “reasonable suspicion justifying a forcible stop of the *202 defendant to conduct a protective pat down search.” (People v Alexander, 120 AD2d 537, 537 [2d Dept 1986].) Thus, even had the frisk not been justified by the fact that the defendant closely matched the suspect described in the report, the circumstances evolved as the defendant refused to comply with Officer Hibbard’s commands that he place his hands on the fence and instead motioned toward his waistband. At this point, the defendant’s nervous behavior, reaching for his waistband and failure to comply with Officer Hibbard’s instructions gave rise to a “legitimate concern” for Officer Hibbard’s safety, entitling him to, in light of the “totality of the circumstances,” physically secure the suspect’s hands so that the danger would be mitigated. (People v Oppedisano, 176 AD2d 667, 668 [1st Dept 1991].)
In the case at bar, the protective frisk was not performed until the defendant failed to comply with the officer’s instructions. The initial command to the defendant, that he place his hands on a fence, was a minimal intrusion justified by the totality of the circumstances. Specifically, where a police officer responds to a report of a man with a gun and encounters a person who in all likelihood is the individual described, the slight intrusion of telling him to place his hands on a fence is justified. The defendant’s suspicious behavior and failure to comply with Officer Hibbard’s instructions permitted the officers to detain and frisk him. As a result, the weapon recovered during the frisk is admissible and the motion to suppress is denied.