

2002 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-26-2002

# USA v. Nelson

Precedential or Non-Precedential:

Docket 1-1177

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2002

Recommended Citation

"USA v. Nelson" (2002). *2002 Decisions.* Paper 202.
http://digitalcommons.law.villanova.edu/thirdcircuit_2002/202

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2002 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed March 26, 2002

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NO. 01-1177

UNITED STATES OF AMERICA

v.

TERRANCE NELSON
aka
TERRENCE NELSON
aka
ALSHERIES NELSON
aka
RAJOHN NELSON
aka
MALIK JONES

Terrance Nelson,
        Appellant

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Criminal No. 98-cr-00454)
District Judge: Honorable William G. Bassler

Argued December 4, 2001

Before: ALITO, RENDELL and AMBRO, Circuit Judges

(Filed March 26, 2002)

Eric Tunis, Esq. [ARGUED]
20 Northfield Avenue
West Orange, NJ 07052
 Counsel for Appellant

George S. Leone, Esq.
Office of the U.S. Attorney
970 Broad Street, Room 700
Newark, NJ 07102

Norman J. Gross, Esq. [ARGUED]
Office of the U.S. Attorney
Camden Federal Building &
 Courthouse
401 Market Street
P.O. Box 2098, 4th Floor
Camden, NJ 08101
 Counsel for Appellee

OPINION OF THE COURT

RENDELL, Circuit Judge.

This appeal raises once again the difficult issue of balancing the much-prized interest of our citizens in being free from search and seizure against the need for law enforcement officers to investigate criminal conduct and protect the public's, and their own, safety. As the Supreme Court has described our task, it is: "to recognize that the Fourth Amendment governs all intrusions by agents of the public upon personal security, and to make the scope of the particular intrusion, in light of all the exigencies of the case, a central element in the analysis of reasonableness." Terry v. Ohio, 392 U.S. 1, 19 (1968).

In the nearly 34 years since its decision in Terry, the Supreme Court has repeatedly opined as to how courts are to strike that balance in different factual settings. Recently, the Supreme Court reiterated that courts are not to evaluate factors in isolation, but are instead to evaluate the totality of the circumstances, and to afford to officers the opportunity to "draw on their own experience and specialized training to make inferences from and

2

deductions about the cumulative information available to them that `might well elude an untrained person.' " United States v. Arvizu, 534 U.S. ___; 122 S. Ct. 744, 750–51 (January 15, 2002).[1]

I. Statement of Facts and Procedural History

Lt. Zacche had been with the Jersey City Police Department since 1979, serving as a patrolman, plainclothesman, sergeant and lieutenant. He had served on the Narcotics Squad, the Juvenile and Missing Persons Unit, and had been assigned to the Federal Drug Enforcement Administration office in Newark. As lieutenant, Zacche was in the Field Leadership and Training Unit, where he was responsible for training officers who had recently been promoted to supervisors as to "how to handle various calls in the street."

On November 5, 1997, Lt. Zacche was the highest ranking field officer on his shift, and, as such, was responsible for the coordination of interagency cooperation if there was a major incident, and for ensuring that police responded to calls in a timely fashion. He received a telephone call on a private line used only by family members of the police officers and confidential informants. The caller asked to speak to Officer Goldrich, a narcotics officer. When advised that Officer Goldrich was not there, the caller--without identifying himself--informed Lt. Zacche that two "jump out boys" from Newark were "running our pockets." Lt. Zacche understood "running pockets" as a distinctive phrase used to describe armed hold–ups of drug dealers that had been taking place in that area. The caller recounted that two black males were involved and were driving in a gray BMW with tags in the rear window. "It's just cruising up and down the drive, sticking us up, man. You better do something." The caller stated that the car was

_____

1. The District Court had jurisdiction pursuant to 18 U.S.C. S 3231. We have jurisdiction pursuant to 28 U.S.C. S 1291, as this is an appeal from a final decision, and pursuant to 18 U.S.C. S 3742(a), because this is an appeal from a final sentence in a criminal case. Our review of the reasonableness of the stop is plenary. United States v. Valentine, 232 F.3d 350, 353 (3d Cir. 2000), cert. denied, 532 U.S. 1014 (2001).

on Martin Luther King Drive in the area of Stegman. Lt. Zacche immediately broadcast the information to all of the officers in the South and West districts of Jersey City. He also went out to pursue the call. A second, later phone call, was made from a pay phone near the intersection of Stegman St. and Ocean Ave. to Jersey City 911, also reporting that two black men in a gray BMW with temporary license plates were "riding around sticking up people." That call was also broadcast.

Nelson was a passenger in a gray BMW that was driving on Martin Luther King Drive during the early morning hours. At about 1:00 a.m., the car was pulled over based on the information provided by the two broadcasts. 2 A gun that was protruding from the waistband of Nelson's pants was visible to the plainclothes officer who approached the passenger's side of the vehicle. It was a 9 mm. Lorcin semiautomatic handgun with an obliterated serial number and a laser gun sight. The officer asked the passenger to step out of the car. When he did, the officer removed the gun, patted him down, handcuffed him, placed him under arrest and read him his rights. It was determined that Nelson was on parole and had previously been convicted of several felonies, including armed robbery. The District Court considered whether a "reasonably prudent man in the circumstances of the officer would be warranted in the belief that his safety or that of others was in jeopardy," recognizing that an officer may draw inferences based on his experience, but may not "base the stop on an inchoate and unparticularized suspicion or hunch." Applying that standard, the District Court found that the totality of the circumstances gave rise to a reasonable suspicion that justified the limited intrusion of a Terry stop. For the

_____

2. The officers contended that one reason for stopping the vehicle was that they had witnessed it run a red light; evidence was presented -- and accepted by the District Court -- that the signal was actually in blinking mode at the time, and that there was no predicate traffic violation to justify the stop. There is no issue about the traffic violation before us on
appeal. The officers also testified, however, that they were traveling on Martin Luther King Drive to look for a gray BMW with temporary tags and two black males inside in response to Lt. Zacche's broadcast.

reasons stated below, we agree, and we will therefore affirm
Nelson's conviction and sentence.3

II. Terry v. Ohio Jurisprudence

In 2000, the United States Supreme Court decided two
cases in which the justification for a stop was in dispute:
Florida v. J.L., 529 U.S. 266 (2000), and Illinois v. Wardlow,
528 U.S. 119 (2000). Although the parties focus their
discussion on J.L., the case whose facts are most closely
analogous to our own, we find the analysis in both cases
valuable in our assessment of what is necessary to justify
a stop.

A. Florida v. J.L.

"On October 13, 1995, an anonymous caller reported to
the Miami-Dade Police that a young black male standing at
a particular bus stop and wearing a plaid shirt was
carrying a gun." 529 U.S. at 268. After an unspecified
amount of time, two officers approached the bus stop and
noticed three young men, one of whom wore a plaid shirt.
None of the young men was behaving suspiciously; no
weapons were evident; and none of the young men ran. Id.
The police officers frisked all three young men and found a
_____

3. On appeal, Nelson has raised three issues. The other two issues --
one a challenge to the prosecutor's alleged vouching, and the other a
challenge under Apprendi v. New Jersey, 530 U.S. 466 (2000), based on
the District Court's failure to submit Nelson's recidivism to the jury --
we find to be without merit. The District Court found the vouching,
which did not seek to divert the jury from the evidence or its assessment
of it, not to constitute reversible error. We review the decision for
abuse
of discretion, and if we find error, we examine whether the error was of
constitutional proportions; if not, we affirm if there is a "high
probability"
the error did not contribute to the conviction. But if the error does
involve a violation of a constitutional right it must be harmless beyond
a reasonable doubt. United States v. Molina-Guevara, 96 F.3d 698, 703
(3d Cir. 1996). Applying that standard, we will not disturb the District
Court's ruling. Regarding Apprendi, the use of prior convictions without
a jury finding is explicitly excluded from the scope of Apprendi. See 530
U.S. at 490 ("Other than the fact of a prior conviction, any fact that
increases the penalty for a crime beyond the prescribed statutory
maximum must be submitted to a jury, and proved beyond a reasonable
doubt."). Only the Terry issue warrants extensive analysis.

5

gun on J.L. He was subsequently charged with carrying a concealed firearm without a license and possession of a firearm while under the age of 18. Id. at 269.

In determining that the police were not justified in their stop of J.L., the Court noted several important factors:

> – the telephone call was from an unknown caller and an unknown location.
>
> – the officers had no other basis or observations to justify their actions.
>
> – there was no corroborating evidence to "think the tipster had inside knowledge about the suspect and therefore to credit his assertion . . . ."

Id. at 270.

In addressing Florida's arguments, the Court refuted assumptions and resolved controversies that had permeated decisions of the courts of appeals and district courts. The first of these was that an accurate description was sufficient to infer reliability. As the Court stated:

> An accurate description of a subject's readily observable location and appearance is of course reliable in this limited sense: It will help the police correctly identify the person whom the tipster means to accuse. Such a tip, however, does not show that the tipster has knowledge of concealed criminal activity. The reasonable suspicion here at issue requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person.

Id. at 272.

The Court also rejected the commonly-held perception that allegations of gun possession lessen the reliability that is otherwise required. The Court opined that the very rationale of requiring only reasonable suspicion, rather than probable cause, to warrant a Terry stop was precisely to accommodate the need for police to respond to dangerous situations posed by guns. While the Court acknowledged that some dangers might be great enough, or in some situations the expectation of privacy might be reduced enough, to justify a search without any indicia of

reliability (for instance if it was reported that a person was carrying a bomb), the Court emphasized that in all other instances, a stop is justified only if there is sufficient reliability to support a reasonable suspicion. Id. at 273-74.

B. Illinois v. Wardlow

Two months prior to J.L., the Supreme Court handed down its opinion in Illinois v. Wardlow. There, officers were patrolling an area that had been subject to heavy drug trafficking. They observed a man holding a bag. When the man saw the officers, he fled. The Illinois Supreme Court had held that the combination of flight and a high crime area were insufficient to justify a Terry stop. The United States Supreme Court reversed.

It noted that "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion." 528 U.S. at 124. And it held that in combination the flight and the high crime area justified the stop. But it also stressed that "officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation." Id. And it reiterated that the stop's being in a high crime area was "among the relevant contextual considerations in a Terry analysis." Id.

C. The Predecessors to J.L. and Wardlow

The reasoning of both J.L. and Wardlow drew on principles established in several of the Court's earlier decisions. In United States v. Hensley, for example, the Court established that whether the officers making an investigatory stop were justified in their decision depends on whether the officer doing the broadcasting (or, in the specific facts upon which Hensley was predicated, the drawing up of a wanted poster) possessed a "reasonable suspicion" on the basis of "articulable facts." 469 U.S. 221, 232-33 (1985).

The Supreme Court has repeatedly recognized that a reasonable suspicion may be the result of any combination of one or several factors: specialized knowledge and investigative inferences (United States v. Cortez), personal observation of suspicious behavior (Terry v. Ohio),

7

information from sources that have proven to be reliable, and information from sources that -- while unknown to the police -- prove by the accuracy and intimacy of the information provided to be reliable at least as to the details contained within that tip (Alabama v. White). In United States v. Cortez the Court expanded on the standard:

> Courts have used a variety of terms to capture the elusive concept of what cause is sufficient to authorize police to stop a person. Terms like "articulable reasons" and "founded suspicion" are not self-defining; they fall short of providing clear guidance dispositive of the myriad factual situations that arise. But the essence of all that has been written is that the totality of the circumstances -- the whole picture -- must be taken into account. Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity.

449 U.S. 411, 417-18 (1981). The Court stressed that, in performing the requisite calculus, the evaluation of the totality of the circumstances must give rise to a particularized suspicion, because "[this] demand for specificity in the information upon which police action is predicated is the central teaching of this Court's Fourth Amendment jurisprudence." Id. at 418 (quoting Terry at 21, n.18).

In Cortez, a case in which the Court upheld a police stop of a vehicle based on the officers' observations and knowledge of how aliens were being smuggled, the Court accorded great weight to the officers' knowledge of the area being observed as a crossing point for aliens, and on the pattern of operations they had discerned through their investigations. Id. at 419.

The Supreme Court has just issued another opinion construing reasonable suspicion in the context of cross-border smuggling. See United States v. Arvizu , 534 U.S. ___; 122 S. Ct. 744. In Arvizu drugs, rather than aliens, were being smuggled. The Ninth Circuit found the stop to be illegal under Terry, characterizing each factor that contributed to the officer's decision to stop the van either as

8

carrying "little or no weight in the reasonable-suspicion calculus" or as inadequate to justify the stop. Id. at 750. Reversing, the Supreme Court emphasized that the "particularized and objective basis" for an officer's reasonable suspicion arises out of the "totality of the circumstances." Id. at 750. The Court also counseled that officers' experience and specialized training may allow them to make inferences and deductions from information that "might well elude an untrained person." Id . at 751 (quoting Cortez, 449 U.S. at 418.).

In Adams v. Williams, 407 U.S. 143 (1972), the Court addressed whether tips could form the basis of reasonable suspicion, concluding that where the tip was itself reliable, it could itself be the basis of the reasonable suspicion, but where the reliability of the tip was unknown or in doubt, reasonable suspicion had to rest on more than just the tip.

> Informants' tips, like all other clues and evidence coming to a policeman on the scene, may vary greatly in their value and reliability. One simple rule will not cover every situation. Some tips, completely lacking in indicia of reliability, would either warrant no police response or require further investigation before a forcible stop of a suspect would be authorized. But in some situations -- for example, when the victim of a street crime seeks immediate police aid and gives a description of his assailant, or when a credible informant warns of a specific impending crime -- the subtleties of the hearsay rule should not thwart an appropriate police response.

Id. at 147. The Court also accorded importance to the fact that the stop occurred in a high crime area and during the early morning hours justified officers' fear for their safety. Id. at 147-48. Also, "[t]he Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape." Id. at 145.

The Court examined the propriety of a magistrate's reliance on an anonymous tip to establish probable cause to issue a search warrant in Illinois v. Gates , 462 U.S. 213

9

(1983). The Illinois Supreme Court had utilized a two-prong test to determine that the tip could not establish probable cause, evaluating the veracity of the informant and the basis of the knowledge provided. Id. at 230 n.4. Because the author of the tip was unknown, the first ("veracity") prong could not be established. The second "basis of knowledge" prong could not be established because the details provided were insufficient to infer how the writer knew of the defendant's activities. Id. at 229-30. While agreeing that it was important to evaluate an informant's veracity, reliability, and basis of knowledge, the Court rejected the rigid application of "separate and independent requirements," stressing instead that probable cause could be established only by examining the "totality of the circumstances." Id. at 230-31. The Court found that the DEA agents' knowledge of the pattern of drug run behavior, combined with the fact that the agents' investigation corroborated the details provided in the anonymous letter were sufficient to constitute probable cause. Id . at 243-44. The Court specifically disagreed with the Illinois Supreme Court's discounting of the corroborative details as "innocent activity," stating that "innocent behavior frequently will provide the basis for a showing of probable cause" and that "[i]n making a determination of probable cause the relevant inquiry is not whether particular conduct is `innocent' or `guilty,' but the degree of suspicion that attaches to particular types of noncriminal acts." Id. at 245 n.13.

The Supreme Court revisited the reliability of anonymous tips in Alabama v. White, 496 U.S. 325, 329 (1990), concluding there that an anonymous tip that provided "virtually nothing from which one might conclude that [the caller] is either honest or his information reliable" and that provided no information that independently provided a basis for suspecting criminal activity, was insufficient to support a Terry stop. The Court emphasized the value that knowing an informant contributes to assessing the reliability of a tip, concluding that where there is no basis for determining the reliability of a tip from the informant, the information contained in the tip cannot by itself be sufficient to provide probable cause or even reasonable suspicion to justify a Terry stop. Instead, police must investigate further to provide independent corroboration of

10

the tip in order to justify stopping the target of the tip. Id. at 329. Such independent corroboration is measured by both the quantity and quality of the totality of the circumstances. If, for example, a tip on its own carries few indicia of reliability, much corroborating information is necessary to demonstrate reasonable suspicion. Id. at 330. Thus, where the tip contains information that later investigation contradicts, or that is of such a general nature as to be easily obtained by any observer, there is no reasonable suspicion. In White, in contrast, even though the tip was wholly anonymous, the details provided in the tip were sufficiently particularized and accurate to reflect a "special familiarity" with the subject of the information. Id. at 332. There, the "special familiarity" was demonstrated by the accurate prediction of the defendant's future behavior. Id.

D. Third Circuit Jurisprudence

We recently had an opportunity to construe J.L . in United States v. Valentine, 232 F.3d 350 (3d Cir. 2000). Two officers had been patrolling a high crime area during the early morning hours when they were flagged down by a man who claimed he had just seen a man with a gun and described the man's attire and his companion. The informant refused to identify himself. The officers found two men matching the informant's description in the parking lot of a nearby restaurant, accompanied by a third man. When they saw the police officers, they began to walk away. One of the officers asked Valentine to come and place his hands on the car; Valentine tried to charge past him, and, as he did so, Valentine's gun fell to the ground.

There, we attached great weight to the fact that the informant had just witnessed a crime. We also attributed greater reliability to the informant's tip than to an anonymous phone call because the officers had an opportunity to appraise the witness's credibility through observation. We noted specifically that we were concerned not so much with whether the informant could be traced as "whether the tip should be deemed sufficiently trustworthy in light of the total circumstances." Id. at 355. We also recognized in Valentine, as the Supreme Court had stated in Gates and has recently reaffirmed in Arvizu, that acts

that in isolation may be "innocent in itself " or at least susceptible to an innocent interpretation, may collectively amount to reasonable suspicion. 534 U.S. at ___; 122 S. Ct. at 751. The other factor present in Valentine that has been absent in many of the cases that we have found inadequate to support a reasonable suspicion is the timing of the information relative to the commission of a crime, particularly a crime of violence. When criminal activity is reported to be ongoing, the public expects the police to take action based on the reports. As we expressed in Valentine, "if the police officers had done nothing and continued on their way after receiving the informant's tip, the officers would have been remiss." 232 F.3d at 356.

In upholding the stop as reasonable, we distinguished United States v. Ubiles, 224 F.3d 213 (3d Cir. 2000), a case factually similar to Valentine. In Ubiles, a man approached a group of officers during a festival to indicate that there was a man in the crowd whom he had seen with a gun. The officers frisked the identified man and recovered a gun. However, in the Virgin Islands, such gun possession is not illegal, and the informant never alleged that any illegal activity had occurred or would occur. Id. at 215. In drawing the distinction, we emphasized that officers can consider the time and area, as well as suspicious responses-- in Valentine, the walking away upon seeing the officers -- in determining whether suspicion is reasonable. Id . at 356-57. Additionally, we noted that in Valentine, unlike in Ubiles, the mere possession of a gun without a permit was illegal. Id.

We also note that, four years before J.L., we invalidated a stop in a high-crime area where the anonymous tip called in to the police described a person, his attire, and his location and reported that he was selling drugs. United States v. Roberson, 90 F.3d 75, 79-80 (3d Cir. 1996). When the officers arrived at the location, they saw a person who matched the description, first standing on the corner, then talking to someone in a car. Id. at 80. It was early evening, and the officers testified that Roberson's behavior was "normal" for the neighborhood; there was nothing suspicious about his presence on the corner nor the rate at which he walked to the car. Id. Under the circumstances,

12

we found that the "anonymous and bare-bones tip" that could have been generated by a caller "looking out his window" was inadequate. An individual's presence in a residential neighborhood, even at a "hot corner" known for drug sales, could not, of itself, give rise to a reasonable suspicion justifying the investigative stop of Mr. Roberson. Id. at 79-80.

III. Analysis

Against the backdrop of Supreme Court guidance and our precedents, we assess whether the communications to the police possessed sufficient indicia of reliability, when considering the totality of the circumstances, for us to conclude that the officers possessed an objectively reasonable suspicion sufficient to justify a Terry stop. We find that they do. In order for the stop of the car to be justified, the officers stopping the car must have had reasonable suspicion. One element of that reasonable suspicion has not been contested here: no one disputes that the gray BMW with a tag in the back window and two black males inside matched precisely the broadcast information; nor that the car was on the road described in the first broadcast.4 Because the officers stopping the car did so based on the fact that the car and individuals matched the description broadcast over the police radio, the reasonableness of the stop in this case depends on the reliability of the tip itself. Did Lt. Zacche have sufficient grounds to view the tip as reliable and issue the radio bulletin pursuant to which the car was stopped? See, e.g., Hensley, 469 U.S. at 232-33. See also United States v. Colon, 250 F.3d 130 (2d Cir. 2001)(determining the

_____

4. This is not a situation such as we confronted in United States v. Kithcart, 134 F.3d 529, 531 (3d Cir. 1998) where the officer saw only one person in a car, but still pulled it over, when the transmission had reported a car containing two persons (and there in fact turned out to be two in the car). The transmission in Kithcart had also identified the car as possibly a Z-28 or Camaro, and the car pulled over was actually a Nissan 300ZX.

13

reasonableness of a stop based on whether the original recipient of the tip had reasonable suspicion.). 5

We conclude that he did. Even though Lt. Zacche did not personally know the informant or his identity, he did know that the caller had a previous relationship with the police, and he was justified in inferring that the caller was an informant. Here, while Lt. Zacche did not have the "opportunity to assess the informant's credibility and demeanor" that we considered significant in Valentine, see 232 F.3d at 354, the informant used a private line whose number was disseminated only to family members and informants, and the caller asked for one of Lt. Zacche's coworkers by name. In J.L., the Court noted that one of the characteristics of a known informant that contributes to reliability is that he or she can be held responsible if the allegations turn out to be fabricated. 529 U.S. at 270. Here, the informant was not truly anonymous, because both the caller and Lt. Zacche knew that another officer could potentially identify the caller. This risk increased the reliability of the caller. As well, the posture of the caller allowed the officer to infer that the caller was himself a victim of the criminal activity –– "they're running our pockets" and "sticking us up, man. You better do something." Adams specifically indicated that a victim of a crime who "seeks immediate police aid and gives a description of his assailant" warrants a police response. 407 U.S. at 147. We said in Valentine that reports of present or imminent crime in a high crime area at a suspicious hour warrant a response, and indeed, that "if the police officers had done nothing and continued on their way after receiving the informant's tip, the officers would have been remiss." 232 F.3d at 356. The same is true here. In the Supreme Court's most recent pronouncement on the Fourth Amendment reasonable suspicion standard, it

_____

5. The dissent would appear to require an independent reason to stop the car –– swerving or erratic behavior –– but our reading of the case law leads us to conclude that, given the reasonable suspicion that the individuals in the car had committed the crimes reported, based on the exact match of the unique description –– car, plates, occupants and direction of travel –– no additional suspicious conduct was required to justify the stop.

14

accorded great deference to the officer's knowledge of the nature and the nuances of the type of criminal activity that he had observed in his experience, almost to the point of permitting it to be the focal point of the analysis. 534 U.S. at ___; 122 S. Ct. at 751-53. Lt. Zacche's perception of the reliability of the call in this case deserves similar respect.

Further, the information that was provided to Lt. Zacche conformed to his specialized knowledge of a pattern of criminal activity and to the location where that activity had been occurring, and utilized certain language that was peculiar to those criminal activities. Lt. Zacche was justified therefore, under the precedents of Terry, Cortez, and Arvizu, in drawing upon his specialized knowledge and experience in considering the information provided to be reliable.

While the informant's call did not merit as much credence as a face-to-face report or a call from an informant who identified himself would have, nonetheless, the use of the private line and the officer's name, coupled with the accuracy and "inside" nature of the information, as well as its urgency, afforded the call sufficient indicia of reliability to arouse a reasonable suspicion. In weighing all of the information available to Lt. Zacche, the tip here was closer to the one upheld in Adams than the one disapproved in Gates.

Under Hensley, then, the officers that heard the broadcasts were reasonable in relying upon the information provided. The second broadcast, standing alone, would not have possessed sufficient indicia of reliability-- it was wholly anonymous and received on a generally available telephone line, even though it did originate from a high-crime area and was reporting current criminal activity. In these circumstances, though, it served both to confirm the type of activity reported in the first call and to heighten the officers' awareness of the need for intervention, since the second call confirmed that the crimes were ongoing.

The officers were then able to corroborate the details provided in the phone calls, and the totality of circumstances bolstered the reasonable suspicion necessary to justify the Terry stop. While the details provided were not the predictions of future activity that

15

established the veracity of the tip in White, they did report accurately observable characteristics -- the color and make of the car and the fact that it had tags in the back window, the fact that the car was traveling in the vicinity of the original report, and the number, gender, and race of the occupants. In Gates, the Court recognized that when an informant has been shown to be right about some things, he is probably right about others, including the alleged criminal activity. 462 U.S. at 244. The fact that Nelson, like Valentine, was in a high-crime area during the late night to early morning hours, and the fact that every detail provided by the informant matched the details observed by the officers, and that some of those details established a particularized suspicion, warranted the limited intervention of an investigatory stop.

We disagree with Nelson's argument that such a finding of reasonable suspicion is precluded both by J.L. and by our own case law. In part, Nelson is concerned that the District Court placed too much reliance on the tipster's allegation that the suspects had a gun. Prior to J.L., many courts had interpreted some of the language in earlier Supreme Court cases to warrant extra caution on the part of police when a tip alleged that a suspect was armed. As we noted above, J.L. stated emphatically that no such "gun exception" existed. While the District Court does state that it is "important to note" that the "probability of gunplay" was alleged, and it does cite as support cases that required only a "weak corroboration of facts" when tips about guns were provided, we think that the critical element alleged in the tip was not the mere presence of a gun, but the fact that violent crimes were in the process of being committed. Further, at the hearing on Defendant's Supplemental Motion for a New Trial, held October 2, 2000, the District Court indicated that the ongoing criminal activity here distinguished the situation from one in which "there's a guy hanging out on the street and he's got a gun on him.. . . [where] [t]here was no indication that he was engaged in or about to engage in any kind of criminal activity." We believe that J.L. was addressing a tendency by courts to use suspicion of possession of a gun to justify the stop, but it did not disturb the Supreme Court's consistent prior teaching that an officer, in determining whether there is

16

reasonable suspicion, may take into account reports of an active threat, including the presence and use of dangerous weapons. J.L. did not disturb the officers' ability to consider the prospect of harm to others or to themselves, for that matter. Here, there were alleged repeated and ongoing acts of victimization that, with a gun, could be deadly.

Appellant also challenges the sufficiency of the information provided in the tip because it was not "predictive." As discussed above, in White the Supreme Court noted the importance of differentiating between facts that could be observed by anyone and those that would be known only to someone intimately familiar with the criminal activity alleged. In White, the tip satisfied the latter requirement because its predictions were sufficiently specific to impute to the informant the particularized knowledge stressed by the Court since the earliest cases. See, e.g., Terry, Cortez. But we find that, while predictive information can demonstrate particularized knowledge, other aspects of the tip can reflect particularized knowledge as well. Here -- as in Cortez -- what made the knowledge "particularized" was the way in which the specific details of language, type of activity and location matched a pattern of criminal activity known to the police, but not to the general public. The tipster did not need to know Nelson's future behavior in order to demonstrate the sort of "inside information" that connoted the caller's familiarity with the conduct being reported. Also, the tipster was complaining of activity that was happening to him; he was one of the people being victimized, and was likely an informant. It was only reasonable to conclude that he possessed special knowledge. In J.L., in contrast, the only information provided identified a man standing in a particular location, dressed in certain clothes, and carrying a gun, all of which was information that was readily observable by anyone, and none of which would imply any special knowledge on the part of the observer, let alone implicate ongoing or imminent criminal activity. This lack of any connection to criminal activity was ultimately the factor in Ubiles that distinguished it from Valentine.

Nelson also contends that the District Court erroneously distinguished our opinion in United States v. Roberson, 90

17

F.3d 75 (3d Cir. 1996), arguing that Roberson is "factually indistinguishable from the present case." We disagree. While again focusing on the predictive nature of the particularized information provided in White, we emphasized in Roberson that what distinguished particularized facts that do support a reasonable suspicion from generalized facts that do not, is whether "anyone" could have provided the information on which the police relied, and whether the details were known "to the general public." 90 F.3d 75, 79. There, the facts provided were generally observable, not particularized. Further, there was no indication from the "anonymous and bare-bones tip" that the tip was based on inside information rather than on raw observation. Id. at 79-80. Here, in contrast, the tip provided particularized information about the crimes that were being committed that corresponded to specialized knowledge that Lt. Zacche had. Thus, the tip could not have been generated by the general public, nor based solely on observation.

Our dissenting colleague relies on Roberson as setting forth a binding "anonymous tip" rule for our court, but in doing so emasculates the circumstances surrounding the specific call in question, its content and import, and the knowledge of the officer receiving it. None of these facts was present in Roberson, but these facts were the focus in Gates and White, which we discussed above and which opinions provided the essence of our reasoning in Roberson. Reliability, predictability, and corroboration do not mean that an officer must have probable cause. Rather, they mean that, given all the facts, the suspicion must be reasonable. Key to our ruling in Roberson was our finding of a "fleshless" tip that provided "only readily observable information." 90 F.3d at 80. Here, we have more.

IV. Conclusion

In conclusion, we follow the Supreme Court's admonition that reasonable suspicion cannot be reduced to "a neat set of legal rules," lest our focus on factors in isolation blind us to the "totality of the circumstances" that must guide our assessment of police behavior. Arvizu, 534 U.S. at __; 122 S. Ct. at 751. Here, considering that the initial tip came

18

from an individual who had a prior relationship with the police force, that it indicated specific "inside" knowledge, and that it appeared to come from one who was an informant and a victim, Lt. Zacche was "entitled to make an assessment of the situation in light of his specialized training and familiarity" with drug trafficking in general and recent events and activity in the area in particular. Id. at 752. Accordingly, the officers receiving the information and observing a vehicle matching it in every detail, were reasonable in making the Terry stop. For these reasons, we will AFFIRM the decision of the District Court.

19

AMBRO, Circuit Judge, dissenting:

I respectfully dissent. While the majority purportedly relies on "the totality of the circumstances" in reaching its result, the record illustrates that the tip here came from an anonymous caller, offered no predictive information of future events, and was not adequately corroborated by the arresting officers. The majority's opinion, in my view, is inconsistent with Florida v. J.L., 529 U.S. 266 (2000), and United States v. Roberson, 90 F.3d 75 (3d Cir. 1996), both of which involved circumstances analogous to those present here. Following those controlling decisions, I would reverse the District Court's ruling.

In evaluating the existence of reasonable suspicion, the Court must look at the "totality of the circumstances" measured by "what the officers knew before they conducted their search." J.L., 529 U.S. at 271. Where initial suspicion arises not from officer observation but from an identifiable informant's tip, only minimal police corroboration may be needed to justify an investigative stop. Adams v. Williams, 407 U.S. 143, 147 (1972). Where the informant is identified, his veracity, basis of knowledge, and track record of providing information may suggest the tip's inherent reliability. Id.

In contrast, "an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity inasmuch as ordinary citizens generally do not provide extensive recitations of the basis of their everyday observations and given that the veracity of persons supplying anonymous tips is by hypothesis largely unknown, and unknowable." Alabama v. White , 496 U.S. 325, 329 (1990). Because of the inherent unreliability of such information, an anonymous tip must contain "something more" before reasonable suspicion arises. Id. This higher standard dictates that reasonable suspicion only arises from a "truly anonymous"[1] tip if it provides predictive future facts and the officers corroborate the information by observing illegal or unusual conduct

_____

1. As discussed later, a tip is "truly anonymous" if it is made from "an unknown location by an unknown caller." J.L. , 529 U.S. at 270; see id. at 275 (Kennedy, J., concurring).

suggesting "that criminal activity may be afoot." Id. at 332; J.L., 529 U.S. at 272; see id. at 275 (Kennedy, J., concurring); Terry v. Ohio, 392 U.S. 1, 30 (1968).

Both J.L. and Roberson illustrate the difficulty of finding reasonable suspicion from an anonymous tip. In J.L., an anonymous caller alleged that a "young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun." 529 U.S. at 268. The Supreme Court held that no reasonable suspicion arose because the tip offered no predictive future facts that the police could corroborate. Id. at 271.

Similarly, Roberson involved an anonymous caller who alleged that "a heavy-set, black male wearing dark green pants, a white hooded sweatshirt, and a brown leather jacket was selling drugs on the 2100 block of Chelten Avenue." 90 F.3d at 79. Judge (now Chief Judge) Becker, writing for the majority, stated that reasonable suspicion was lacking because "the police had no basis for assessing either the reliability of the informant or the grounds on which the informant believed that a crime was being committed." Id. at 80.

Under this legal framework, we address the situation before us. During the early hours of November 5, 1997, Lieutenant Zacche was on duty in the Jersey City Police Department, Southern District. While at the precinct he answered a call on an untaped telephone used primarily by officers' families and confidential informants. The male caller asked for Officer Goldrich, a narcotics officer in the precinct. Zacche identified himself, stated that Officer Goldrich was off-duty, and asked the caller if he could be of assistance. The caller refused to identify himself, and instead informed Zacche that "two black males in a gray BMW with a tag in the window was cruising up and down Martin Luther King Drive in the area of Stegman." The caller further stated that the two men were "jump out boys" from Newark who were "running our pockets."

From these circumstances, the majority unearths reasonable suspicion justifying a stop of Nelson's vehicle. Of concern is the majority's conclusion that the informant's call "was not truly anonymous," and thus the tip need not

21

provide "something more" before giving rise to reasonable suspicion. An informant's call is anonymous when it is made from "an unknown location by an unknown caller." J.L., 529 U.S. at 270. Here, the informant offered no information from which the officers could identify his location. The call was unrecorded. Id. at 276 (Kennedy, J., concurring) (distinguishing truly anonymous calls from those where "[v]oice recording of telephone tips might . . . be used by police to locate the caller"). The tipster did not state how, when, or where he observed the alleged activity. United States v. Valentine, 232 F.3d 350, 354 (3d Cir. 2000); see New York v. Herold, 726 N.Y.S.2d 65, 66 (N.Y. App. Div. 2001) (finding an informant not truly anonymous where he observed criminal activity in one apartment from a specific apartment in the same building).

Nor did the anonymous informant offer any information suggesting his true identity. J.L., 529 U.S. at 275 (Kennedy, J., concurring) (distinguishing a truly anonymous tipster from an informant who has a proven track record of providing reliable information); Valentine, 232 F.3d at 354 (distinguishing face-to-face informants from truly anonymous tipsters). The tip was also untraceable. J.L., 529 U.S. at 276 (Kennedy, J., concurring) (distinguishing truly anonymous tips from those where "the ability of the police to trace the identity of anonymous telephone informants may be a factor which lends reliability"); see Arizona v. Gomez, 6 P.3d 765, 768 (Ariz. Ct. App. 2000) (stating that a tipster placed her credibility at risk by calling from her traceable private home phone).

From the tipster's mere mention of an officer's name, the majority concludes that the caller was not anonymous. To the contrary, the tipster's specific request for Officer Goldrich only suggested, at best, his willingness to disclose or compromise his identity, a predisposition upon which he never acted. Further, nothing in the record suggests that the caller actually possessed that willingness. "The whole picture" here shows that the call was made from "an unknown location by an unknown caller," and thus the caller remained cloaked in anonymity with the ability to "lie with impunity." J.L., 529 U.S. at 275.

22

Further, Lieutenant Zacche, the supervising officer in the case, believed that the tip was an anonymous one. At the suppression hearing, he offered the following statement:

> Q: Now, the information that you got over the phone after you left the bathroom was an anonymous tip. Correct?
>
> A: Yes, sir.
>
> Q: You have no idea who provided with you [sic] the information. Is that right?
>
> A: No, I don't.

The majority purports to give Lt. Zacche's "perception" of the call "great deference . . . almost to the point of permitting it to be the focal point of the analysis." Maj. Op. at 15. Yet the majority fails to give any deference to Lt. Zacche's statement regarding the issue of anonymity.

As noted above, an anonymous tip may provide reasonable suspicion if independent police observation corroborates its prediction of the suspect's future acts. White, 496 U.S. at 332. The majority concedes, as it must, that the anonymous tip here provided no predictive future facts.2 The majority attempts to circumvent this requirement by stating that a reliable tip need only show that the informant possesses "inside information that connoted the caller's familiarity with the conduct being reported." In the context of an anonymous tip, however, the Supreme Court has never applied this relaxed "inside information" standard. Indeed, the Supreme Court has only found an anonymous tip reliable when it contained significant predictive future facts. Id.

Even under the majority's "inside information" standard, the record refutes its assertion that the tip offered "particularized" knowledge relating to "a pattern of criminal activity known to the police, but not to the general public." Unfortunately, robberies of this kind were common

_____

2. For example, in White, which the Supreme Court considered "a close case," the anonymous tipster offered predicative future facts regarding the alleged criminal's time of departure, intended destination, and likely route. 496 U.S. at 331.

occurrences in this particular area, as Lt. Zacche acknowledges in his testimony:

Q: How common is drug dealing in that area?

A: Stegman -- Stegman between the areas of Ocean, MLK, Stegman, that small two block radius is one of the most popular drug locations in the city.

Q: And how do you know that?

A: I spent nearly 10 years in narcotics and six of them I was assigned in the Southern District as a narcotics sergeant.

Q: How common are robberies in that area?

A: We had a big rash of robberies where we were having rival groups from either areas of Jersey City or out-of-towners coming in and they were sticking up the local dealers.

Q: Okay. I was going to ask, how common are robberies in particular regarding drug dealers in that area?

A: Too many robberies.

From this testimony I find it a stretch to infer that "inside information" known only to the police was being reported to them. Further, Lt. Zacche states that these robberies were common among "rival groups," suggesting a motive for why an anonymous tipster might offer false information. 3 In Roberson, Chief Judge Becker warned that "anyone of us could face significant intrusion on the say-so of an anonymous prankster, rival, or misinformed individual." 90 F.3d at 80-81 (emphasis added). This case is the Chief Judge's admonition come to life.

The majority believes that the officers had reasonable suspicion based on their corroboration of the reported observable characteristics, i.e., the car's description, its location, and the number, race, and gender of its occupants. The Supreme Court rejected an identical claim in J.L.:

_____

3. In fact, the police made no efforts to verify whether the passengers in the gray BMW actually committed any stickups.

24

An accurate description of a subject's readily observable location and appearance is of course reliable in this limited sense: It will help the police correctly identify the person whom the tipster means to accuse. Such a tip, however, does not show that the tipster has knowledge of concealed criminal activity. The reasonable suspicion here at issue requires that a tip be reliable in its assertion of illegality , not just in its tendency to identify a determinate person.

529 U.S. at 272 (emphasis added). The Court thus made it clear that corroboration of the tip's alleged criminal activity is essential. Id.; see also Roberson, 90 F.3d at 80 (holding that even though the police corroborated the tip's "readily observable facts," no reasonable suspicion arose because the officers did not notice "unusual or suspicious conduct on [the suspect's] part"). As in J.L.  and Roberson, the police here failed to corroborate the tip's claim of criminal activity. Further, the police observed no unusual or suspicious behavior by the passengers in the BMW, and the vehicle was not being driven in a swerving, erratic, or evasive manner. The officers' only observation was of two black men in a BMW lawfully driving down a street, and that, as far as I know, is not illegal, unusual, or suspicious. Unwilling or unable to corroborate the tip's allegation of criminal activity, the police instead fabricated a traffic violation to mask the absence of reasonable suspicion. Fortunately for these officers, the majority conjures what an anonymous tip and minimal police work could not: the reasonable suspicion necessary to justify stopping Nelson's vehicle.

The majority also argues that a second 911 call helped corroborate the first anonymous tip. However, the record suggests that this 911 call is irrelevant to our determination of reasonable suspicion. "The reasonableness of official suspicion must be measured by what the officers knew before they conducted their search." J.L., 529 U.S. at 271 (emphasis added). Contrary to the majority's reading, there is no evidence that Officers Legowski and Petrovcik knew of this 911 call before stopping Nelson's vehicle.

25

Thus, the second call cannot factor into the reasonable suspicion analysis.4

In J.L., the Supreme Court held that no reasonable suspicion arose based on a set of facts involving (1) an anonymous tip, (2) an allegation that a "young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun," (3) no predictive future facts, and (4) no police corroboration of the alleged criminal activity. 529 U.S. at 268–71.

In Roberson, this Court held that no reasonable suspicion arose based on a set of facts involving (1) an anonymous tip, (2) an allegation that "a heavy-set, black male wearing dark green pants, a white hooded sweatshirt, and a brown leather jacket was selling drugs on the 2100 block of Chelten Avenue," (3) no predictive future facts, and (4) no police corroboration of the alleged criminal activity. 90 F.3d at 79–80.

As in J.L. and Roberson, the "whole picture" before us involves (1) an anonymous tip, (2) an allegation that two black males in a gray BMW were riding on MLK Drive robbing drug dealers, (3) no predictive future facts, and (4) no police corroboration of the alleged criminal activity.

_____

4. Two additional arguments warrant brief response. The majority reads too much into the caller's statement that the suspects were "running our pockets." This situation is much different from those where the police had identifiable evidence of the informant's status as a victim or witness.
See Adams, 407 U.S. at 147 (discussing tips from known informants); Valentine, 232 F.3d at 354 (involving a face-to-face informant who witnessed criminal activity). Moreover, the tip here offered no information
regarding how or when the informant observed the alleged activity. Valentine, 232 F.3d at 354.

Second, the majority relies on the fact that the alleged activity took place in a high crime area. While this fact is part of the "whole picture,"
Illinois v. Wardlow, 528 U.S. 119, 124 (2000), its presence is not crucial.
Indeed, this factor was also present in Roberson , and we still found reasonable suspicion lacking under circumstances analogous to those present here. 90 F.3 at 80; see Wardlow, 528 U.S. at 124 ("An individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime.").

26

J.L. and Roberson, in my view, control this case. Thus I respectfully dissent.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit

27