**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 25-1090

———————

UNITED STATES OF AMERICA,

Appellant

v.

DEVIN TRAVIS

———————

Appeal from the United States District Court
for the District of New Jersey
District Court No. 3:24-cr-00265-001)
District Judge: Honorable Zahid N. Quraishi

———————

Submitted under Third Circuit L.A.R. 34.1(a)
November 14, 2025

Before: RESTREPO, McKEE, and AMBRO, <u>Circuit Judges</u>

(Opinion filed:  December 5, 2025)

## OPINION[*]

AMBRO, <u>Circuit Judge</u>

The Government charged Devin Travis with unlawfully possessing a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1). He moved to suppress the critical piece of evidence supporting the charge—a loaded revolver officers discovered while frisking him. The United States District Court for the District of New Jersey granted the motion to suppress. We reverse and remand for the reasons that follow.

**I.**

Shortly after midnight on February 13, 2024, a security guard working at an apartment building in East Orange, New Jersey called the police to report that a man was "trying to get inside the building" after getting "kicked out already." GX-1. The guard stated that the man was "circling the parking lot" and peering into vehicles to see if they were open. *Id*. Officers Jah-vel Henry and Errol Lindo responded to the call. When they arrived, the guard told them that a live security camera feed showed that the man she called to report for suspicious behavior was still there, and at that moment was standing outside a back door of the building. She escorted them to that location, where the officers found Devin Travis and an unidentified woman standing outside.

---

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

The officers allowed the unidentified woman to enter the building. On encountering Travis, they asked him why he was trying to get into the building, and he replied that he was there to visit someone. They asked if he had any identification, and he replied that he did not.

Travis's hands were in his pockets when the interaction began. After he failed to produce identification, the officers instructed Travis to remove his hands from his pockets. He complied and removed the contents of his jacket pockets, which included an EZ pass and some papers. Moments later, Travis returned his hands to his pockets. The officers again instructed him to remove his hands from his pockets. He did so again but then returned them back to his pockets moments later. At approximately the same time Travis returned his hands to his pockets for a second time, the officers instructed him to place his hands against the wall for a pat-down search. Travis protested that they had no reason to search him. The officers then reiterated their command and placed their hands on Travis to begin frisking him. He resisted, and a physical altercation followed. The officers then handcuffed Travis to a nearby fence and patted him down for weapons. They found a loaded revolver in his pants.

Because Travis had prior felony convictions, the Government charged him with possessing a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1). He moved to suppress the revolver on Fourth Amendment grounds, arguing the officers lacked

reasonable suspicion to support the search and seizure. The District Court agreed and granted the motion to suppress.[1] The Government appeals that decision.

## II.

The District Court had jurisdiction under 18 U.S.C. § 3231. We have appellate jurisdiction under 18 U.S.C. § 3731. We review the grant of a motion to suppress for "clear error as to the underlying factual findings" and de novo as to the "application of the law to those facts." *United States v. Perez*, 280 F.3d 318, 336 (3d Cir. 2002).

The Fourth Amendment prohibits "unreasonable searches and seizures . . . ." U.S. CONST. amend. IV. Generally, to make a seizure consistent with the Fourth Amendment, an officer must obtain a warrant supported by probable cause. *Katz v. United States*, 389 U.S. 347, 356—57 (1967). But under the *Terry* exception to the warrant requirement, "an officer may[] . . . conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (construing *Terry v. Ohio*, 392 U.S. 1 (1968)). "Any evidence obtained pursuant to an investigatory stop . . . that does not meet this exception must be suppressed . . . ." *United States v. Brown*, 448 F.3d 239, 244 (3d Cir. 2006). We exercise plenary review over "the District Court's legal conclusion that the officers lacked

---

[1] Travis also argued that suppression was warranted because the officers lacked probable cause. The District Court agreed with Travis, and the Government does not challenge that conclusion on appeal.

sufficient reasonable articulable suspicion to effect[] a *Terry* stop." *United States v. Torres*, 534 F.3d 207, 209 (3d Cir. 2008).

## The Investigatory Stop

To assess whether reasonable suspicion supported the seizure, we first determine the moment the officers seized Travis within the meaning of the Fourth Amendment. *Id*. at 210. We then evaluate whether the officers had reasonable suspicion to suspect Travis of criminal activity based on the totality of the circumstances known to them at that moment. *Id*. Even though the officers' knowledge anchors our inquiry, the test is an objective one. *Brown*, 448 F.3d at 246.

A seizure occurs in this context when a suspect "submits to a show of authority." *Id*. at 245 (citation modified). The District Court found that the officers seized Travis the moment they approached him and began asking questions. It based this finding on (1) Officer Henry's testimony at the suppression hearing that Travis was not free to leave during the encounter, (2) that the officers "converged" on his location and ordered him to pull down his face mask and remove his hands from his pockets, and (3) that they blocked the entry to the building and made clear to Travis he was not permitted to enter. *United States v. Travis*, No. CR 24-265 (ZNQ), 2024 WL 5117562, at *6 (D.N.J. Dec. 16, 2024). We agree with the District Court's finding.[2] The circumstances it identified would reasonably communicate to Travis that his compliance was not optional. *See*

---

[2] In the District Court proceedings, the Government argued that approaching Travis to ask him questions is not a seizure within the meaning of the Fourth Amendment at all. On appeal, it "disagrees" with the District Court's finding but offers no argument to challenge it. Opening Br. 12.

5

*Haberle v. Troxell*, 885 F.3d 170, 176 (3d Cir. 2018) (explaining that a seizure occurs when there is "communication that would convey to a reasonable person that compliance was not optional").

For the seizure to comply with the Fourth Amendment, the facts known to the officers at the moment of seizure must support a "particularized and objective basis for suspecting [Travis] of criminal activity." *Brown*, 448 F.3d at 246 (quoting *United States v. Cortez*, 449 U.S. 411, 417—18 (1981)). While a less demanding standard than probable cause, reasonable suspicion requires "at least a minimal level of objective justification for making the stop." *Wardlow*, 528 U.S. at 123. "In evaluating whether there was an objective basis for reasonable suspicion, we consider 'the totality of the circumstances—the whole picture.'" *Brown*, 448 F.3d at 246-47 (quoting *Cortez*, 449 U.S. at 417).

We conclude the officers had an objective basis to suspect Travis of criminal activity. To repeat, the security guard working at the building that night called 911 to report that a person was "trying to get inside the building" even after getting "kicked out already," and that he was "circling the parking lot" and "checking cars" to see if they were open. GX-1. When an officer acts on a reliable tip, the tip can "itself be the basis of . . . reasonable suspicion." *United States v. Nelson*, 284 F.3d 472, 478 (3d Cir. 2002).

The District Court found the tip insufficient because it did not allege criminal behavior. True, a tip must point to illegality to provide an officer with reasonable suspicion sufficient to make an investigative stop. *United States v. Goodrich*, 450 F.3d 552, 563 (3d Cir. 2006). The District Court reasoned that "peering into cars" is not

6

criminal, unusual, or suspicious, and therefore the tip could not give the officers an objective basis for suspecting criminal activity. We do not agree with that conclusion.

First, it does not matter that peering into cars is itself a legal activity. *See United States v. Ubiles*, 224 F.3d 213, 217 (3d Cir. 2000) ("[R]easonable suspicion of criminal activity may be formed by observing exclusively legal activity."). Second, to characterize the behavior the tip described as not unusual or suspicious runs counter to everyday experience. The security guard alleged that Travis was circling the parking lot and looking into cars to see if they were open. Because the guard called 911 to report this, "if the . . . officers had done nothing and continued on their way after receiving the . . . tip, [they] would have been remiss." *United States v. Valentine*, 232 F.3d 350, 356 (3d Cir. 2000). Third, the District Court's analysis did not note that the security guard also alleged that Travis kept trying to get into the building after already getting kicked out—which straightforwardly alleges criminal trespass.[3] The tip provided an objective basis for the officers to suspect Travis of criminal activity.

The District Court also found this tip could not support reasonable suspicion because the officers did not "observe any video footage of [Travis's] prior activity which would corroborate" the security guard's accusations. *Travis*, 2024 WL 5117562, at *8..

---

[3] In New Jersey, a person commits the offense of defiant trespass if "knowing that he is not licensed or privileged to do so, he enters or remains in any place as to which notice against trespass is given." N.J. Stat. Ann. § 2C:18-3(b). The New Jersey Supreme Court explains that "even a brief willful entry onto another's property may constitute a violation . . . ." *State v. Gibson*, 95 A.3d 110, 116 (N.J. 2014). Because the security guard alleged that Travis kept trying to enter the building after getting kicked out, the officers had an objective basis to suspect Travis of defiant trespass.

7

But the officers did not need to review corroborative evidence supporting the tip's allegations to form reasonable suspicion based on it. *See United States v. McCants*, 952 F.3d 416, 423 (3d Cir. 2020) ("The absence of corroborative evidence . . . d[oes] not negate the reasonable suspicion created by the [tip]."). A tip only requires corroboration when it lacks inherent reliability. *See Brown*, 448 F.3d at 252 (considering whether a tip was supported by corroborating information only after determining it was inherently unreliable based on the context and circumstances). This tip did not lack inherent reliability.

To assess whether a tip is reliable, we consider: (1) whether it was given in person; (2) whether the informant could be held responsible if the allegations proved untrue; (3) whether the information would not be available to the ordinary observer; (4) whether the informant had recently witnessed the conduct at issue; and (5) whether the information proved accurate. *United States v. Torres*, 961 F.3d 618, 623—24 (3d Cir. 2020). This is not a rote checklist. "A tip need not bear all of the indicia of reliability—or even any particular indicium—to supply reasonable suspicion." *Id.* (citation modified). We consider the totality of the circumstances to determine whether it provided sufficient indicia of reliability. *Brown*, 448 F.3d at 250. Even though the security guard initially delivered the tip to a 911 dispatcher, she affirmed its substance in person to the officers when they arrived at the building. If the allegations proved false, they could hold her accountable.[4] Because the security guard had access to live security camera surveillance

---

[4] We have treated an officer's ability to hold an informant accountable as connected to his ability to track down the informant after investigating the tip. *See Torres*, 961 F.3d at

of the apartment building, she had access to information not available to an ordinary observer. And the guard had recently witnessed the conduct at issue. These factors thus support the tip's reliability here.

Other circumstances support our result. This is not a case of an anonymous tipster reporting a trespass simply because she did not recognize a person in the building. No one was in a better position than the building's on-duty security guard to identify potential trespassers. This tip had strong guarantees of inherent reliability, and thus did not require corroboration to support reasonable suspicion.

The District Court also concluded the officers could not have reasonably relied on the tip because Travis told them he was at the building to visit a tenant. But the Court correctly found at an earlier step in its analysis that the seizure occurred "the moment the officers approached [Travis]." *Travis*, 2024 WL 5117562, at *6. We measure the existence of reasonable suspicion based on the knowledge they had at that moment. *See United States v. Lowe*, 791 F.3d 424, 430 (3d Cir. 2015). The moment of seizure preceded Travis' innocuous explanation for his behavior. It is thus improper to consider whether his explanation could defeat the officers' objective basis for reasonable suspicion.

Finally, the District Court also found that the officers lacked reasonable suspicion because they treated the unidentified woman standing outside the building differently

---

624 (explaining that an officer would be able to hold a tipster accountable despite not knowing his name or license plate number because the officer "kn[ew] what the man looked like and the make of the car that he drove").

than they treated Travis. The Court's conclusion appears to rest on the premise that reasonable suspicion is defeated when an officer conducts a poor investigation.[5] The Court cites no authority for this premise, nor could it—the relevant inquiry is whether the facts known to the officers at the moment of seizure provide an objective basis for reasonably suspecting criminal activity. The quality of the investigation that follows is irrelevant.

We conclude the District Court erred in finding a lack of reasonable suspicion. The tip had enough indicia of reliability to provide the officers with an objective basis to suspect Travis of criminal activity.

### The Weapons Search

Reasonable suspicion to stop Travis for investigative purposes does not, without more, justify frisking him. *See United States v. Gatlin*, 613 F.3d 374, 378 (3d Cir. 2010) ("The stop and the search are independent actions, and each requires its own justification."). To determine whether a frisk is justified, we consider whether the officers "ha[d] reason to believe that [they were] dealing with an armed and dangerous individual." *Terry*, 392 U.S. at 27. As with the prior inquiry, we consider the totality of the circumstances. *See United States v. Johnson*, 592 F.3d 442, 452 (3d Cir. 2010).

---

[5] We express no view on the quality of the officers' investigation. We merely take this to be the District Court's view because it states that "the officers treated [Travis] differently from the woman," and that if they had treated Travis the same way they treated her, they "would have easily learned . . . that [Travis] was there to see his girlfriend." *Travis*, 2024 WL 5117562, at *8.

10

We conclude the officers' search was justified here. Travis acted suspiciously by returning his hands to his pockets twice after the officers instructed him to remove them.[6] *See United States v. Hill*, 811 Fed. App'x 761, 764 (3d Cir. 2020) (explaining that a suspect "return[ing] his hands to his pockets, despite requests not to do so, suggest[s] that he may have been armed"). His behavior thus provided an objective basis for the officers reasonably to fear for their safety. *See United States v. Cornelius*, 391 F.3d 965, 968 (8th Cir. 2004) (explaining that it was reasonable for officers to fear for their safety when a suspect failed to follow an instruction to remove his hand from his pocket); *United States*

[6] The District Court found that Travis "returned his hands to his pockets *only once* before being subjected to a frisk." *Travis*, 2024 WL 5117562, at *10 (emphasis added). In fact, Officer Henry's body camera footage shows that he and Officer Lindo first instructed Travis to remove his hands from his pockets at the timestamp marked 46:38. Five seconds later, at 46:43, Travis complies. He then returns his hands to his pockets for the first time at 46:56, three seconds after he initially removed them. Then, at 47:00, the officers again instructed Travis to remove his hands from his pockets, and he complied two seconds later at 47:02. He then returned his hands to his pockets for the second time another two seconds later at 47:04. It is not until 47:12—eight seconds after Travis returned his hands to his pockets a second time—that the Officers initiated the frisk. The difference between our interpretation of the body camera footage and the District Court's may stem from the fact that Officer Lindo instructed Travis to put his hands against the wall for a frisk at 47:04, roughly the same moment Travis put his hands back into his pocket for a second time. It is possible the Court treated that moment as the inception of the frisk. If it did, then it did not clearly err as a matter of fact, but rather it legally was mistaken in identifying the beginning of the frisk for *Terry* purposes. The timing of Officer Lindo's instruction may show that he formed the subjective intent to perform the frisk at the same moment Travis returned his hands to his pockets for the second time— but we evaluate reasonable suspicion by inquiring whether the "action was justified at its inception." *Terry v. Ohio*, 392 U.S. 1, 20 (1968). "[S]ubjective motive or intent is not relevant" in this context. *United States v. Goodrich*, 450 F.3d 552, 559 (3d Cir. 2006). "Whether [Officer Lindo] intended or was prepared to undertake the frisk" before Travis returned his hands to his pockets for a second time "is not relevant . . . to our objective assessment of whether the frisk was reasonable when performed." *United States v. Pittman*, 338 F.App'x 147, 149 (3d Cir. 2009).

*v. Harris*, 313 F.3d 1228, 1236 (10th Cir. 2002) (explaining that it was reasonable to frisk a suspect after he refused to remove his hands from his pockets).

We also do not evaluate Travis's hand placement in a vacuum. When the officers seized Travis, it was late at night, and they were responding to a tip that described suspicious behavior. *See United States v. Jackson*, 120 F.4th 1210, 1224 (3d Cir. 2024) (instructing that "the time of night" and a suspect's "suspicious conduct" bears on an officer's reasonable fear that a suspect may be armed and dangerous). These additional factors bolster our conclusion. The officers' frisk was justified by a reasonable belief that Travis may have been armed.

The District Court concluded otherwise. It stated that at the time the officers frisked Travis, they "had objectively observed nothing more than [Travis] complying with multiple commands regarding his hands and mouth covering before putting his hands back into his pockets after having just emptied his pockets on a cold February night." *Travis*, 2024 WL 5117562, at *11. It is true that Travis removed his hands from his pockets each time he was asked. The Court is thus correct, in a narrow sense, that Travis "compl[ied] with multiple commands." *Id*. In framing the circumstances leading up to the frisk this way, however, the Court ignores that the officers had to issue the same instruction multiple times in the first place. They could reasonably construe that as "evasive or suspicious conduct." *Jackson*, 120 F.4th at 1224. On considering the totality of the circumstances, the officers' frisk did not violate the Fourth Amendment.[7]

---

[7] Addressing the frisk's reasonableness, the District Court again faulted the officers for treating Travis differently than the unidentified woman they also encountered that night.

*　　*　　*

The officers had an objectively reasonable basis to suspect Travis of criminal activity and to have concern for their safety. The stop and the frisk were thus both justified. We reverse the District Court's grant of Travis' motion to suppress and remand the case to it for further proceedings consistent with this opinion.

---

The Court speculated that if the officers "treated [Travis] in the same manner they treated the unidentified woman," then Travis would have proceeded with his night "without the consequences of what would happen next." *Travis*, 2024 WL 5117562, at *11. These considerations are irrelevant to the frisk's reasonableness. Travis returned his hands to his pockets after the officers instructed him to remove them. That the officers did not similarly instruct the unidentified woman to remove her hands from her pockets has no bearing on the objective grounds for fearing for their safety.